[Civ. No. 10805.   Second Appellate District, Division One.—August 26, 1936.]

LUDOWISKA B. MALONE, as Administratrix, etc., Respondent, v. RED TOP CAB COMPANY OF LOS ANGELES (a Corporation) et al., Appellants.

Harry B. Ellison, J. L. Ronnow and Ackerman, Wayland & Mathews for Appellants.

Erwin P. Werner and Edward Linder for Respondent.

DESMOND, J., *pro tem.*—We here consider consolidated appeals by the Red Top Cab Company and the Yellow Cab Company from a judgment entered in favor of plaintiff on account of her husband's death in a traffic accident. The jury gave judgment also against Grant Halloway, driver of one of the automobiles involved, but he has not appealed.

Red Top Cab Company claims that the evidence was not sufficient to support the judgment and that the court erred in giving and in refusing to give certain instructions. Yellow Cab Company bases its appeal upon the ground that the evidence before the jury was insufficient to prove that a merger of the two companies took place after the accident, and upon the further ground that the court erred in submitting the question of merger to the jury.

We shall pass first upon the points raised by the appeal of the Red Top Cab Company. George Hatfield, driver of a Red Top taxicab testified that, with Richard Malone as a passenger for hire, he was proceeding in an easterly direction on Washington Boulevard in the city of Los Angeles, at about 5 o'clock in the morning of August 28, 1934, and that he entered the intersection at Central Avenue at approximately fifteen miles per hour, dropping from a previous speed of approximately twenty-five miles per hour. While in the intersection formed by the two highways, his cab collided with a Pierce Arrow car which was being driven by Grant Halloway and both cars turned over, Mr. Malone being killed as a result of the collision. Halloway had entered the intersection from the south. He testified that as he approached Washington Boulevard he swung to the left

of a truck that was preceding him and· noticing the boulevard stop signal, put on his brakes and "stopped in the center of the strcet". On cross-examination hc stated, "I couldn't say that I did come to a complete stop and stand for any length of time. . As there was no regulated time to stand there, I didn't check the time that I halted there. After I seen the intersection was clear, and the boulevard was clear, I continued on." On being asked, "Did you bring your car to a complete stop or didn't you?", he answered, "I don't know whether I did or not. I don't know that I did, but I do know that I stopped to observe thc boulevard stop that I seen."

Mr. Hatfield also testified that "when I pulled into thc intersection, . . . I looked south on Central, and there was a truck that had made a boulevard stop. . . . I got almost directly in front of the truck, and I had slowed to about 12 miles an hour at the time, to be sure that the truck had stopped,—which he had stopped,—and I looked up, and a car shot out from behind the truck, and the next thing that happened, that I know of, I was crawling out of the cab." He also testified that when he first saw the Pierce Arrow the front end of his cab was approximately on the northbound tracks "almost across the street". He further stated on cross-examination that there was no traffic in the street other than the truck, and that when he entered the intersection Halloway was not within a half block of it. A witness named Walker testified that Halloway did not stop his car before entering the intersection, that he came through without increasing or decreasing his speed, about 25 or 30 miles per hour. This witness also observed the Red Top cab, thought it entered the intersection before the Pierce Arrow and "Q. It kept going 40 or 45 miles an hour all the time, didn't it? A. Yes, sir; the taxi was coming between 40 and 45. That is what I estimate it."

Another witness, Adams, testified that he was driving south on Central Avenue at the time of the accident, saw both cars as they entered the intersection; that the taxicab was traveling approximately 40 or 45 miles per hour; that "Just before the impact, it had not diminished (its speed) very much, if any";·that the Pierce Arrow drove around to the left of the truck at 20 or 25 miles per hour, "but whether he came to a complete stop or not, I cannot say, but I did

see him check''. Halloway testified that as he approached the intersection he drove around to the left side of the truck that preceded him at about 20 miles per hour. ''I made a quick stop, and I didn't see any car approaching from either side,—the west side or the east side. There was a car facing me, coming south, and when I seen there was no car coming into the intersection from either side, I continued northerly on Central, and when I noticed again to my left, I seen this car,'' etc. This defendant also stated that he was pulling out of the boulevard stop when he first saw the Red Top cab; that it was then ''making what you would call the braking line of the street—that would be the stop line'', and that it was then traveling ''I would say 40 miles an hour''.

The jurors being instructed upon proximate cause, negligence—sole and concurrent—and other pertinent matters, decided upon the evidence before them, including the fact that there was a boulevard stop at the southerly boundary of the intersection, that Halloway and Red Top Cab Company, through its agent Hatfield, were jointly liable for damages resulting from this collision. They were sworn to serve as triers of the facts, and if there is evidence to support their verdict, it must stand. We cannot say that such evidence was not presented to this jury. We have reviewed the instructions given to the jury, as submitted by counsel, and as modified by the court, also the instructions which the court declined to give. After thorough consideration, we find no error here, for we believe that the court's own instructions as well as the withdrawal from the jury of certain instructions originally given, with comments upon that action, set everything in proper form before the jury. The appeal of Red Top Cab Company therefore fails.

Passing now to the questions raised by the appeal of The Yellow Cab Company, we note that a few months after the unfortunate accident in which Mr. Malone lost his life, the following resolution was adopted by the Yellow Cab Company on October 1, 1934.

''Resolved, that this Corporation acquire from Red Top Cab Company of Los Angeles all of its operating properties, consisting of taxicabs and other motor vehicles, meters, shop equipment, garage equipment, office furniture and equipment, building improvements, materials and supplies, cab

stands, licenses and franchises, trade name, color rights and good will, together with one hundred twenty-five (125) permits to operate taxicabs in the City of Los Angeles and three (3) permits to operate taxicabs in Beverly Hills, for a consideration of the assumption by this corporation of the indebtedness of Red Top Cab Company of Los Angeles to General Motors Truck Company in the sum of sixteen thousand, eight hundred seventy-five ($16,875.00) dollars, and to Anglo-California Trust Company in the sum of four thousand two hundred fifty ($4,250.00) dollars and the cancellation of a certain promissory note of Red Top Cab Company of Los Angeles, dated March 15, 1932, payable to Wallace T. Fletter, in the sum of eighty thousand ($80,000.00) dollars and together with the assumption by this corporation as of October 1, 1934, of all unpaid bills and expenses currently incurred by Red Top Cab Company of Los Angeles, as shown by its books of account.

"Further Resolved, that the President and Secretary of this corporation are authorized and directed to take all steps necessary to consummate said purchase."

As to this resolution, Mr. Ronnow, secretary of the Yellow Cab Company, and of counsel on these appeals for that corporation and the Red Top Cab Company, testified under a deposition which was introduced in evidence, "That it is a true and correct copy of the resolution pertaining to the acquisition of the Red Top by the Yellow as of that date." He also testified that there were no other oral or written agreements with respect to the transaction; further, that the taxicabs were all received by the Yellow Cab Company. Section 361 of the Civil Code provides the legal method for effecting a merger and consolidation of corporations, and stockholders cannot complain if that method is followed. The rights of creditors, too, are safeguarded by subdivison 7 of the section providing, as it does, that "the consolidated or surviving corporation shall succeed . . . to all the rights and property of each of the constituent corporations, and shall be subject to all the debts, liabilities and duties of each, in the same manner as if the surviving or consolidated corporation had itself incurred them".

We may note here that the procedure specified by section 361 of the Civil Code is not the only way in which a corporation may divest itself of its entire property.

That may be accomplished also under section 343 of the Civil Code by the expressed will of a majority of the corporation's stockholders, or larger percentage, if specified in the articles of incorporation. Section 343 makes no mention of creditors' rights or the obligation of the purchaser to meet the seller's debts or liabilities, but we believe that such an obligation nevertheless results where, as here, one corporation takes all the property of another corporation, without any consideration passing to the selling corporation which could be made available to meet a creditor's claim. It will be noted that the Yellow Cab Company by the terms of the resolution of October 1, 1934, was to acquire from Red Top Cab Company all of its operating property, specified in great detail, including its licenses and franchises, and particularly its trade name, color rights and good will.

With these facts in mind: First, the lack of any cash, stock, bonds or other property passing to Red Top Cab Company; second, the description of the property acquired in entirety by Yellow Cab Company, the language of the court in *McAlister* v. *American Ry. Express Co.*, 179 N. C. 556 [103 S. E. 129, 130, 15 A. L. R. 1090], compels our attention: "The cases which hold that a new corporation must pay the debts of the original one are those where there was a reorganization, consolidation, amalgamation, or union, and the new company is subjected to liability for the debts and torts of the old company upon the ground of an implied *assumpsit,* or of fraud, or under the trust fund doctrine, or because, by reason of the facts and circumstances, the complete absorption of the old company and its assets, including its franchise, being the leading and controlling one, it is completely substituted in its place and thereby becomes the debtor to its creditors. It would be manifestly unfair, unjust, and contrary to equity that it should thus acquire all of the assets of the other corporation, and its franchise, both to be, and to do, leaving no one to be sued by its creditors and no property to satisfy its debts and other liabilities, and not itself become responsible for such debts and other liabilities. If it takes the benefit, it must, as has so often been said, take the burden, which equitably attaches, with it."

This statement seems to classify the present transaction perfectly, and it is immaterial in our opinion whether it is

called a merger or a sale *cum onere*, for section 361 by subdivision 7 merely writes into the law the equitable rule that governs when no formal merger is effected. The jury in this case was advised by the resolution itself that the good will of Red Top Cab Company, a taxicab corporation, passed to another taxicab corporation and was in position to say upon the testimony before it, including Mr. Ronnow's characterization of the deal as "the acquisition of the Red Top by the Yellow", whether or not such a transaction was completed as would make the Yellow Cab Company liable for the tort of Red Top Cab Company. We believe this question was properly submitted to the jury, and while some of the instructions upon the points involved, submitted by both sides, and as given by the court, are open to criticism, we feel there was nothing in them to mislead the jury.

The judgment is affirmed.

York, Acting P. J., and Doran, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 22, 1936.