[Civ. No. 44003. Second Dist., Div. Two. Apr. 4, 1975.]

REFUGIO ORTIZ, Plaintiff and Respondent, v.
SOUTH BEND LATHE, Defendant, Cross-defendant and Appellant;
MEYER SHEET METAL MACHINERY COMPANY, Defendant,
Cross-complainant and Respondent;
FREMONT INDEMNITY COMPANY, Intervener and Respondent.

844

COUNSEL

Cummins, White & Breidenbach and W. F. Rylaarsdam for Defendant, Cross-defendant and Appellant.

Michael J. McHale and Anderson & McHale for Defendant, Cross-complainant and Respondent.

No appearance for Plaintiff and Respondent and for Intervener and Respondent.

OPINION

**COMPTON, J.**—Sometime prior to August of 1955, the Johnson Machine and Press Company, Inc. (Johnson) manufactured a punch press which was admittedly defective. In August of 1955, Meyer Sheet Metal Machinery Company (Meyer), the sole distributor for Johnson in this area, sold the press to Western Lighting Corp. who continued to use the press until September 1967. In September 1967, plaintiff Refugio Ortiz, an employee of Western Lighting Corp. was injured as a result of the defect in the press. He received workmen's compensation benefits from Fremont Indemnity Company (Fremont), the compensation carrier for Western Lighting.

In 1967, Amsted Corporation, through its subsidiary South Bend Lathe, was engaged in the manufacture of the Johnson press under that trade name and with facilities which formerly belonged to Johnson.

Ortiz commenced this action for damages in tort against Amsted and Meyer. Meyer cross-complained against Amsted for indemnity. Fremont intervened on behalf of plaintiff to recover the workmen's compensation benefits it had paid out. A jury returned a verdict in favor of Ortiz and Fremont as against Amsted and Meyer. The trial court then entered judgment in favor of Meyer as against Amsted for indemnification. Amsted appeals.

Amsted makes no contention that Meyer was guilty of any active negligence, thus the question of Meyer's right to indemnification is not challenged. (See *Rossmoor Sanitation, Inc.* v. *Pylon, Inc.,* 13 Cal.3d 622 [119 Cal.Rptr. 449, 532 P.2d 97].) Nor does Amsted deny that Johnson would be liable to Ortiz and Meyer because of the defect in the press. As of the time of Ortiz' injury, however, Johnson no longer existed.

The issue which is dispositive of the appeal in this case is whether by tracing the history of Johnson and its assets to their ultimate acquisition by Amsted, the latter became burdened with the liabilities of the former.

In 1956, after the manufacture and sale of the machine in question, Johnson was acquired by Bontrager Corporation (Bontrager) an Indiana corporation. The exact nature of this acquisition is not made clear in the record. Suffice to say that shortly thereafter the physical assets of Johnson were transferred to Bontrager and Johnson became a mere "shell" corporation with no assets. A single outstanding share of stock in Johnson was held by Bontrager and carried on its books as an asset of the latter corporation. The corporate "shell" was preserved in order to continue the Johnson trade name in corporate form. Johnson as an entity, however, transacted no business on its own following the acquisition by Bontrager. Both parties agree that as a result of this acquisition Bontrager did assume the liabilities of Johnson, either because the transaction constituted a nonstatutory merger or by virtue of the *alter ego* doctrine. The primary activity of Bontrager was then the manufacture of the Johnson press line.

In 1962, Amsted, pursuant to a purchase agreement with Bontrager, acquired the principal assets of Bontrager, which assets included a manufacturing facility at Elkhart, Indiana, together with the equipment

therein, the trade name and customer lists and the single share of stock in the Johnson "shell." After the acquisition of its assets by Amsted, Bontrager continued in existence for a period of time, holding the cash received in the transaction until it was ultimately liquidated by distributing this cash to its stockholders.

Following the acquisition, as noted earlier, Amsted continued to manufacture the Johnson press line through its subsidiary South Bend Lathe. In August 1965, Johnson was dissolved. Since Johnson's assets had previously been acquired by Bontrager and sold to Amsted, there was at the time of the dissolution no distribution of anything of value to Amsted, the holder of the single share of stock.

The purchase agreement by which Amsted acquired the assets of Bontrager provided that among other things Amsted acquired the right to adopt and use the name Johnson Machine and Press Corporation. The agreement also provided that Amsted would assume certain liabilities of Bontrager but expressly recited that Amsted *would not assume* "any liability, debt or obligation of Bontrager except those expressly . . . assumed under [the] agreement and that Bontrager shall continue to be solely responsible for all its other known or unknown liabilities, debts or obligations arising prior or subsequent to the closing."

There is no question but what Amsted paid adequate and valid consideration, a sum in excess of $1,000,000, for the assets of Bontrager. Nor is there the slightest hint of any fraud in the transaction. The injury in question, and for which liability is sought to be imposed on Amsted, occurred some five years after this acquisition and two years after the total dissolution of Johnson.

The general rule is where one corporation sells or transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the former unless (1) the purchaser expressly or impliedly agrees to such assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape liability for debts. (*Pierce* v. *Riverside Mtg. Securities Co.,* 25 Cal.App.2d 248 [77 P.2d 226]; 15 Fletcher, W., Cyclopedia of the Law of Private Corporations, § 7122; *Kloberdanz* v. *Joy Manufacturing Company,* 288 F.Supp. 817; *Schwartz* v. *McGraw-Edison Co.,* 14 Cal.App.3d 767 [92 Cal.Rptr. 776].)

■ By the terms of the purchase agreement between Amsted and Bontrager there was no express or implied assumption of liability. There was, as noted, no fraud in the transaction and the consideration flowing to Bontrager was ample. Bontrager and Amsted dealt at arms' length, there was no mixture of officers or stockholders. The two corporate entities were completely separate and distinct both before and after the sale. Under these facts there was neither a consolidation or merger nor a continuation or reincarnation of Bontrager, the old corporation. ■ Before one corporation can be said to be a mere continuation or reincarnation of another it is required that there be insufficient consideration running from the new company to the old. (*Enos* v. *Picacho Gold Min. Co.,* 56 Cal.App.2d 765 [133 P.2d 663]; *Malone* v. *Red Top Cab Co.,* 16 Cal.App.2d 268 [60 P.2d 543].)[1]

"An essential foundation of the rule . . . [that equity will regard a new corporation as being a mere continuation of the former corporation under a different name] is the lack of consideration running from the new company to the old." (*Enos,* p. 779.)

■ Amsted did not assume the liabilities of Bontrager either by agreement, express or implied, or involuntarily by operation of law. Nor does it make any difference that the assets which were acquired consisted of trade names, customer lists or business good will. (See *Schwartz* v. *McGraw-Edison Co., supra.*)

---

[1]The dissenting opinion in declaring that "A manufacturer of heavy machinery who undertakes to carry on an existing business must take the good with the bad, and the bad includes defective product liability," relies on *Malone* v. *Red Top Cab Co., supra,* a case involving a transfer of assets for no consideration, *Blank* v. *Olcovich Shoe Corp.,* 20 Cal.App.2d 456 [67 P.2d 376]; *Stanford Hotel Co.* v. *M. Schwind Co.,* 180 Cal. 348 [181 P. 780], and Corporations Code section 4116, none of which authorities support the proposition asserted. Corporations Code section 4116 applies to mergers and consolidations. *Blank* v. *Olcovich Shoe Corp.* and *Stanford Hotel Co.* v. *M. Schwind Co.* deal with fraudulent transfers.

The dissent, without any authority to support it, perceives the "conduct of a business" as something apart from the use of the assets of a business enterprise. A "business" consists of nothing more than the tangible physical assets and the intangible assets of trade name and good will. These are the assets which Amsted acquired in payment of good consideration. If, under *Schwartz* v. *McGraw-Edison Co., supra,* and similar authorities, the acquisition of assets does not perforce carry with it liability then neither would the subsequent use of those assets. The right to use the assets was the obvious objective of the purchase. To carry the proposition of the dissent to its logical extreme is to introduce into the law a principle not heretofore recognized by any authority, i.e., that the acquisition by one individual of the going business of another automatically imposes upon the acquirer liability for the antecedent torts of his predecessor even though adequate consideration changed hands and there is a complete absence of any fraud.

The evidence of the history of these corporate acquisitions was not in dispute, nor was the purchase agreement between Amsted and Bontrager ambiguous so as to require any factual resolution of extrinsic evidence in interpreting its meaning. Thus it was improper for the trial court to submit the question of Amsted's liability to the jury. The question was purely one of law based upon uncontroverted evidence. As such we are not bound to apply the substantial evidence test in determining the correctness of the jury's verdict against Amsted. We are at liberty to make an independent interpretation of the legal questions presented in order to determine whether, under the undisputed evidence, there was, as a matter of law, an imposition of liability on Amsted for the tort of Johnson.

Respondents make the argument that because Johnson continued in existence as a "shell" corporation after the transfer from Bontrager to Amsted of the single share of stock, Amsted assumed Johnson's liabilities at the time of the dissolution of Johnson.

No consolidation or merger of Johnson with Amsted resulted from the dissolution of the Johnson "shell." Strictly speaking, a consolidation signifies such a union as necessarily results in the creation of a new corporation and the termination of the constituents whereas a merger signifies the "absorption of one corporation by another which retains its name and corporate identity with the added capital, franchises and powers of the merged corporation." (15 Fletcher, Cyclopedia of the Law of Private Corporations, § 7041.) The dissolution of the Johnson "shell" did not result in the creation of a new corporation nor did Amsted as a result thereof acquire any added capital, franchise or power that it did not already possess as a result of its purchase of the Bontrager assets.

■ A shareholder in a corporation does not become liable for corporate debts by the act of dissolution except to the extent of the assets received. (19 C.J.S. Corporations, § 1760, p. 1541; *Zinn* v. *Bright,* 9 Cal.App.3d 188 [87 Cal.Rptr. 736].) ■ At the time of Johnson's dissolution, Amsted as a shareholder in a "no-asset" corporation assumed no greater liability than it had before dissolution.

There is nothing in the record to suggest any reason to consider that Amsted was the *alter ego* of Johnson. The case was not tried on that theory.

"The general rule confining the parties upon appeal to the theory advanced below is based on the rationale that the opposing party should not be required to defend for the first time on appeal against a new theory that 'contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial.' " (*Ward* v. *Taggart,* 51 Cal.2d 736, at p. 742 [336 P.2d 534]; also see *Panopulos* v. *Maderis,* 47 Cal.2d 337, at p. 341 [303 P.2d 738].)

It is suggested by respondent that this corporate change of ownership is an effective way of cutting off anticipated future product liability. However, Ortiz in the present situation is no worse off than if Johnson had gone bankrupt early in the game. Furthermore, any deliberate effort to effect a change in corporate ownership solely for the purpose of cutting off liability would, of course, fall within the fraudulent transfer exception of *Schwartz.*

Presumptively, the consideration which flowed to Bontrager was enough to satisfy its creditors and take care of its liabilities, of which the instant claim was one. The record does not disclose whether Ortiz, Fremont or Meyer ever attempted to recover from the former directors or shareholders of Bontrager or whether such recovery is, under Indiana law, still possible. In any event, the instant liability was Bontrager's and not Amsted's and lack of an available remedy against Bontrager would not be grounds for shifting that liability to Amsted.

After all is said and done what occurred in this case is simply that Amsted for adequate and valid consideration acquired the assets of another corporation under circumstances which do not warrant, as an exception to the general rule against it, the involuntary imposition on Amsted of the preexisting liability of Bontrager.

In *McKee* v. *Harris-Seybold Co., Div. of Harris-Int. Corp.,* 190 N.J.Super 555 [264 A.2d 98], a New Jersey court on a factual situation which is indistinguishable from the case at bar reached a similar conclusion.

Contrary to the suggestion contained in the dissenting opinion, we do not "saddle" liability on Meyer. That result is a progeny of the concept of strict liability enunciated in *Vandermark* v. *Ford Motor Co.,* 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168].

The judgments are reversed and the trial court is directed to enter judgment in favor of Amsted on both the complaint and the cross-complaint.

Roth, P. J., concurred.

**FLEMING, J.**—I dissent.

The majority opinion saddles liability on Meyer, an intermediary which had nothing to do with the defective design or manufacture of the machinery that injured Ortiz. The opinion accomplishes this by granting the operator of the Johnson business complete immunity from liability.

Concededly, the operation of the Johnson machinery business passed through the hands of several different operators in a series of complicated transactions. There was, however, continuity of business operation throughout. Each operator succeeded its predecessor in the business of manufacturing and marketing Johnson machinery, and the latest one, Amsted, acquired the Johnson name, premises, plant, equipment, inventory, customer lists, catalogues, and goodwill from its predecessor and continued to operate the Johnson machinery business to the time of the accident. The purchase agreement by which Amsted took over the business specified it was acquiring *"all of the assets* of every kind and character owned by Seller and *used for the conduct of the businesses* of Seller and of Johnson Shear and Brake Corporation, an Indiana corporation, *as heretofore conducted."* (Italics added.)

Amsted, having undertaken to operate the business, thereby assumed the risks growing out of the continuity of business operation. One of these risks was product liability for defective machinery put in circulation at an earlier time and never corrected. While users of an orphaned product no longer actively manufactured or marketed cannot look to an existing manufacturer for parts, repairs, service, information, and the like, users of a product that continues to be manufactured, marketed, and serviced under its original trade name can reasonably expect a degree of protection from the entity currently carrying on the business, even though that entity may not be the one that originally manufactured and marketed the particular item involved. This expectation is particularly justifiable when the product consists of heavy machinery of a type that carries a high risk of personal injury. A manufacturer of heavy machinery who undertakes to carry on an existing business must take the good with the bad, and the bad includes defective product liability. (Cf.

*Malone* v. *Red Top Cab Co.,* 16 Cal.App.2d 268, 273 [60 P.2d 543]; *Gordon* v. *Aztec Brewing Co.,* 33 Cal.2d 514, 521-523 [203 P.2d 522]; *Blank* v. *Olcovich Shoe Corp.,* 20 Cal.App.2d 456, 461-462 [67 P.2d 376]; *Stanford Hotel Co.* v. *M. Schwind Co.,* 180 Cal. 348, 354 [181 P. 780]; .Corp. Code, § 4116.) Product liability today has become an integral part of a manufacturing business, and the liability attaches to the business like fleas to a dog, where it remains imbedded regardless of changes in ownership of the business. So long as the business retains its distinctive identity and character and continues to be operated as it has in the past, defective product liability adheres to the business and remains there until discharged by bankruptcy or comparable judicial act.

I find *Schwartz* v. *McGraw-Edison Co.,* 14 Cal.App.3d 767 [92 Cal.Rptr. 776], distinguishable on the ground that the transfer of ownership took place there almost three years after the accident, thereby giving plaintiff ample opportunity to bring suit against the original owner prior to the transfer. At bench, the change in ownership occurred years before the accident, and Ortiz cannot be charged in 1967 with notice that a change in ownership of the business had occurred in 1962.

If, as Amsted argues, the entity in control of the business between the regimes of Johnson and Amsted should bear ultimate liability, i.e., Bontrager, it is Amsted's responsibility and not a third party's to track down Bontrager and secure indemnity for the loss. Amsted's position is comparable to that of an agent whose ostensible authority includes an implied assumption of tort liability. The agent remains liable to third parties even though it may have a right to recoup from its undisclosed principal.

I would affirm the judgment.

The petition of the defendant and respondent for a hearing by the Supreme Court was denied May 28, 1975. Mosk, J., was of the opinion that the petition should be granted.