171 N.J. Super. 261 (1979)
408 A.2d 818
EFRAIN RAMIREZ AND LAURA RAMIREZ, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
AMSTED INDUSTRIES, INC., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 11, 1979.
Decided November 15, 1979.
*263 Before Judges CRANE, MILMED and KING.
William Pollack argued the cause for appellants.
Norman S. Costanza argued the cause for respondent (Morrison & Griggs, attorneys).
The opinion of the court was delivered by KING, J.A.D.
This case presents the question of whether a corporation which purchases the assets of another corporation for cash may avoid incurring products liability for personal injury claims arising from sales by the seller prior to the purchase of the assets.
Plaintiff Efrain Ramirez alleged that on August 18, 1975 he was injured when a power press he was operating at his job in Belleville, New Jersey, malfunctioned. The power press was *264 described as a Johnson Model 5, 60-ton punch press manufactured in 1948 or 1949 by Johnson Machine and Press Company (Johnson), a then-viable Indiana corporation. Plaintiff contends that defendant Amsted Industries, Inc. (Amsted) is liable to him under the doctrine of strict liability in tort, 2 Restatement, Torts 2d, § 402A at 347, as well as for negligence, as a successor to Johnson. At the conclusion of discovery Amsted obtained summary judgment on the ground that its ultimate acquisition of the assets of Johnson in 1962 imposed no product liability for injury caused by Johnson's machine which was made and sold prior thereto. Plaintiff appeals and contends essentially that, as a matter of public policy, a corporation which purchases all of a manufacturing corporation's assets and continues the business of the seller should not, by reason of the form of the transaction or by exculpatory language in the closing documents, be insulated from then-unripened products claims against the seller.
The deposition testimony of Malcolm W. Burnett, corporate counsel and employee of Amsted, and the agreement memorializing the August 1962 purchase by Amsted of the total assets of Bontrager Corporation (Bontrager), provide the operative and undisputed facts upon which the trial judge ruled. Amsted (originally American Steel Foundaries, Inc.) was formed in the early 1900s and is a diversified manufacturer of steel and railway products. It has engaged in a number of acquisitions over the last three-quarters of a century. Johnson had been in the business of manufacturing machinery in Elkhart, Indiana, since 1937.
On August 28, 1956 Johnson sold all of its assets to Bontrager, an Indiana corporation. Burnett testified that according to the original minutes and resolutions of Johnson's board of directors in his possession Bontrager assumed all of Johnson's liabilities as part of that transaction. On August 31, 1962 Bontrager sold all of its assets to defendant Amsted. This sale included all the Johnson assets which Bontrager had acquired in 1956. As part *265 of this transaction Amsted sought to avoid assumption of any of Bontrager's potential liability for machinery previously sold by Bontrager or Johnson. After the 1962 acquisition of Bontrager's assets Amsted assigned its rights under the purchase agreement to South Bend Lathe, Inc. (South Bend I), its wholly-owned subsidiary, which thereafter functioned as the operating company. Included in this assignment of assets was the one outstanding share of common stock of Johnson, which had survived only as a corporate shell after Johnson's assets had been sold to Bontrager in 1956.
This sole outstanding share of Johnson's stock was held thereafter by Amsted until July 30, 1965, when Johnson was dissolved as an Indiana corporation. Burnett testified that from the time of the 1962 purchase from Bontrager until this dissolution of Johnson as a corporate shell in July 1965 Amsted's officers served as the "officers and directors of Johnson." On September 30, 1965 South Bend I, the wholly-owned subsidiary of Amsted, was dissolved, and "its assets and liabilities were assumed by Amsted" according to Burnett. After South Bend I was dissolved its business "was taken over and run by Amsted as an unincorporated division under the name of South Bend Lathe Company." On June 30, 1975 Amsted sold the business of the South Bend Lathe division to a newly-formed Indiana corporation, named South Bend Lathe, Inc. (South Bend II).
Amsted has an agreement with its purchaser South Bend II "to indemnify them for losses incurred arising out of machinery sold prior to the closing date"  June 30, 1975. Burnett stated that the indemnity agreement contemplated any liability befalling South Bend II for any machines marketed by any corporate predecessor: "If South Bend Lathe [II] could be held liable for something done by Johnson Machine and Press, it would come within the terms of the indemnity agreement."
The fate of Bontrager is not revealed by the present record. It has not been joined as a party defendant. With respect to the transaction described above, one court has found that Bontrager *266 was ultimately liquidated by a distribution of cash to its shareholders, Ortiz v. South Bend Lathe Co., 46 Cal. App.3d 842, 846, 120 Cal. Rptr. 556, 558 (D.Ct.App. 1975). Another court has found that Bontrager had continued an "inert corporate existence." Korzetz v. Amsted Industries, Inc., 472 F. Supp. 136, 144 (E.D. Mich. 1979). Defendant Amsted does not contend here that Bontrager is presently viable and able to respond in damages to plaintiff in the event of a judgment. Whatever Bontrager's ultimate fate may have been it is irrelevant to our conclusion in this case.
Pursuant to the August 1962 contract Amsted purchased substantially all of the assets of Bontrager. These assets represented the Elkhart, Indiana, manufacturing facility operated by Johnson before 1956. The contract recited the transfer of (1) all inventory, (2) all machinery, equipment, fixtures, tools, etc., (3) "all other tangible personal property ... owned by Seller on the closing date, wherever located," (4) all patents, trademarks, trade names, copyrights, applications therefor, and trade secrets, (5) all real property at the manufacturing plant in Elkhart, (6) all pending contracts and (7) all books and records. The contract specifically called for the transfer of the single share of outstanding capital stock in Johnson (referred to therein as the "subsidiary.") The purchase price was $1,200,300. Bontrager's representations set forth in the contract clearly contemplate the transfer of a viable, operating manufacturing company to the buyer, Amsted.
Section 4(g) of the contract conferred on the buyer the exclusive right "to adopt and use the name `Johnson Machine & Press Corporation'." Burnett testified that "the name Johnson appears as a trade name that was one of the transferred assets." Bontrager also agreed to use "its best efforts to make available to purchaser the services of all of seller's present employees" with the exception of seller's three principals, who covenanted personally not to compete with the buyer in the United States for five years.
*267 Regarding the liabilities of Bontrager, the contract at section 2(c), entitled "Assumption of Liabilities," provided that Amsted would assume responsibility for:
(i) Obligations of Seller (other than those in default or arising from any breach or default of Seller) accruing subsequent to the close of business on the Closing Date under the contracts described in Section 1(d) but only with respect to benefits received thereunder by Purchaser subsequent to the close of business on the Closing Date;
(ii) All normal credit balances owing to Seller's customers appearing in Seller's accounts at the close of business on the Closing Date;
(iii) All obligations of Seller to its employees other than officers, whether arising by operation of law, by contract or by past custom, for unpaid vacation pay, bonuses, and other forms of compensation accruing on or prior to the Closing Date; and
(iv) Seller's pro rata portion of real estate and personal property taxes as initially determined in accordance with sub-section (i) of Section 7.
The payments described in sub-section (a) and (b) of this Section 2 and the assumption of the liabilities of Seller described in sub-sections (ii), (iii), and (iv) of this Section 2(c) shall be allocated among the Transferred Assets and applied thereto as set forth in Exhibit E attached hereto. It is understood and agreed that Purchaser shall not assume or be liable for any liabilities or obligations other than those herein expressly assumed by Purchaser; all other liabilities and obligations of Seller shall be paid, performed and discharged by Seller. [Emphasis supplied].
In subsection 13(f) the contract stated:

Other Liabilities. It is understood that Purchaser is not assuming any liability, debt or obligation of Seller except those expressly required to be assumed by Purchaser under this agreement and that Seller shall continue to be solely responsible for all its other known or unknown liabilities, debts and obligations arising prior or subsequent to the Closing.
On the particular point of liability for future product defect claims § 8 of the contract stated:

Defective Products. All machines sold by Seller on or prior to the Closing Date shall be deemed for the purpose of this Section 8 to be products of Seller, *268 and Seller alone shall be responsible, to the extent of the warranties heretofore given by Seller to its customers, for all liability for the correction and repair of defects in material or workmanship thereof involving costs and expenses in excess of $50 per machine. Purchaser agrees to perform the necessary work to correct and repair the defects involved in such claims for and on behalf of Seller, and Seller agrees to assume and pay for the costs and expenses occasioned by such work to the extent of the warranties heretofore given by Seller to its customers: provided, however, that if either D.P. Huffman or H.D. Mitchell, or any person designated by either of them for such purpose, shall then be available for consultation upon reasonable notice, Purchaser or its assignee shall obtain the approval (which approval will not be unreasonably withheld) of one of such persons with respect to claims reasonably estimated by purchaser to amount to more than $50.
Thus, a clear intent to negate assumption of liability for contingent product claims is manifest from the agreement. Finally, Bontrager agreed to indemnify Amsted for any liability imposed upon it as a result of any loss incurred by seller's conduct.
While there is no decision on the pivotal issue in this case from our State's highest court, it appears that traditional corporate law rules governing liability of a successor corporation for claims arising from its predecessor's conduct have been followed to date in New Jersey. This court has recently stated:
The principle is well settled that where one company sells or otherwise transfers all of its assets to another company the latter is not liable for the debts and liabilities of the transferor, including those arising out of the latter's tortious conduct, except where (1) the purchaser expressly or impliedly agrees to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuance of the selling corporation, or (4) the transaction is entered into fraudulently in order to escape liability for such debts. McKee v. Harris-Seybold Co., 109 N.J. Super. 555, 561-562 (Law Div. 1970), aff'd o.b., 118 N.J. Super. 480 (App.Div. 1972). See also, Wilson v. Fare Well Corp., 140 N.J. Super. 476, 484 (Law Div. 1976); Jackson v. Diamond T. Trucking Co., 100 N.J. Super. 186, 192 *269 (Law Div. 1968); Menacho v. Adamson United Co., 420 F. Supp. 128 (D.N.J. 1976); 19 Am.Jur.2d, Corporations, § 1546 at 922-924 (1965) 15 Fletcher, Cyclopedia of the Law of Private Corporations (rev. perm. ed. 1973), § 1722 at 187. [Jackson v. N.J. Mfrs. Ins. Co., 166 N.J. Super. 448, 454-455 (App.Div. 1979)]
A fifth exception, sometimes incorporated as an element of one of the above exceptions, is the absence of adequate consideration for the sale or transfer. McKee v. Harris-Seybold Co., 109 N.J. Super. 555, 561-562 (Law Div. 1970), aff'd on other grounds, 118 N.J. Super. 480 (App.Div. 1972).[1] Thus, a straight cash acquisition, without assumption of liabilities and for adequate consideration, imposes no liability on the transferee corporation.
In Jackson this court held that the defendant before the court was not factually or legally a successor entity to the partnership which had made and sold the allegedly defective machinery in 1931, many years before the 1973 accident. There was no suggestion in Jackson that plaintiff there urged this court to depart from the traditional corporate rules. Recognizing that application of these traditional principles recited in Jackson would compel an affirmance in this case, plaintiff here asks us to reject these traditional rules and adopt a special rule governing a successor's liability for its predecessor's defective products. The recent trend towards a rule imposing liability on the successor corporation without regard to the niceties of corporate transfers where the successor has acquired and has continued *270 the predecessor's commercial activity in an essentially unchanged manner is illustrated by the holdings of Ray v. Alad Corp., 19 Cal.3d 22, 136 Cal. Rptr. 574, 560 P.2d 3 (Sup.Ct. 1977); Turner v. Bituminous Cas. Co., 397 Mich. 406, 244 N.W.2d 873 (Sup.Ct. 1976); Cyr v. B. Offen & Co., Inc., 501 F.2d 1145 (1 Cir.1974) (N.H. Law); Knapp v. North American Rockwell Corp., 506 F.2d 361, 371 (3 Cir.1974) (Pa. Law) cert. den. 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975). See also, Andrews v. John E. Smith's Sons Co., 369 So.2d 781 (Ala.Sup.Ct. 1979) (adopting an estoppel theory of liability against a successor for holding itself out as predecessor), and 1 Frumer & Friedman, Products Liability, § 5.06 (1979).
The cases representing this recent trend towards imposing liability where the successor continues the predecessor's product line and manufacturing operations eschew the traditional corporate law analysis in favor of a product liability law analysis, i.e., the alleged social desirability of spreading the risk of defective products at the expense of the marketing enterprise which is supposedly better equipped to absorb the sting of unexpected injuries and damages.
In Knapp v. North American Rockwell Corp., above, the Third Circuit looked to the nature and consequences of the transaction and found a de facto merger for product liability purposes despite the absence of many of the formal characteristics traditionally associated with a corporate merger. The Circuit Court concluded that while neither plaintiff nor the successor corporation were ever in a position to prevent the accident caused by the predecessor's defective products, as between the two parties the successor was "better able to spread the burden of the loss." 506 F.2d at 370. The court in Knapp concluded that the continuation of the predecessor as a "barren" corporate shell after the sale of assets was no reason to deny recovery against the successor. Judge Adams described the Knapp court's undertaking to determine the Pennsylvania law a task "to be resolved *271 by an analysis of public policy considerations rather than by a mere procrustean application of formalities." Id. at 369.
In Cyr v. B. Offen & Co., Inc., above, the First Circuit gave the following analysis in upholding a jury verdict against a successor corporation:
The very existence of strict liability for manufacturers implies a basic judgment that the hazards of predicting and insuring for risk from defective products are better borne by the manufacturer than by the consumer. The manufacturer's successor, carrying over the experience and expertise of the manufacturer, is likewise in a better position than the consumer to gauge the risks and the costs of meeting them. The successor knows the product, is as able to calculate the risk of defects as the predecessor, is in position to insure therefor and reflect such cost in sale negotiations, and is the only entity capable of improving the quality of the product.
As for the second and third policy reasons, enumerated above, it is true that the successor, by definition, was not the legal entity which launched the product on the stream of commerce or made an implied representation as to its safety. But in the most real sense it is profiting from an exploiting all of the accumulated good will which the products have earned, both in its outward representations of continuity and in its internal adherence to the same line of equipment. [501 F.2d 1154]
The Cyr court specifically rejected the successor's contention that it was absolved from strict product liability by language of exculpation in the purchase agreement. The court observed that while the language specifically excluding contingent products liability governed the rights of the corporate parties, it could not diminish the rights of future unknown claimants.
A majority of the Michigan Supreme Court adopted the products liability analysis and rejected the traditional corporate approach in Turner v. Bituminous Cas. Co., above. That court held that the type of corporate transfer should not control. Whether there is a traditional merger by a mutual exchange of stock, a de facto merger by the purchase of one corporation's assets with stock of a second corporation, or a purchase of corporate assets for cash, the plight of the injured victim is the same. The greatest stress should be on the continuity of the *272 business operation, not the mechanics of acquisition, said the Michigan Supreme Court. It noted that in these transfers the very purpose of the corporate acquisition is usually to preserve for business purposes the identity of the predecessor. "Continuity is the purpose, continuity is the watch word, continuity is the fact." 244 N.W.2d at 882. The court in Turner also rejected the contention that imposition of liability would discourage and stifle legitimate corporate transfers as "far too speculative." Id. at 883. It concluded that once corporations became aware of successor products liability, economic adjustments through liability insurance, indemnity agreements, escrow accounts or even sale price adjustments would be implemented. See Shannon v. Samuel Langston Co., 379 F. Supp. 797, 802 (W.D.Mich. 1974). These corporate transactions are typically intricate but they are also flexible and adaptable to particular situations. The nub of the reasoning of Michigan's highest court was:
Furthermore, we must recognize that it does not make sense or promote justice to require a merger and a de facto merger to respond to products liability suits, and then to leave a transfer of assets for cash free from suit, when the needs and objectives of both the injured party and the corporation are the same in all three instances. Finally, it is difficult to see that the possibility of products liability litigation is a manageable problem in mergers and de facto mergers, and an unmanageable one when corporate assets are sold for cash. [Turner v. Bituminous Cas. Co., 244 N.W.2d at 883]
In Ray v. Alad, above, the California Supreme Court totally abandoned the traditional test and approached the issue solely in terms of the policies undergirding strict liability in tort and products law. The California high court found justification for imposing successor liability for three reasons: (1) the virtual destruction of plaintiff's remedies against the original manufacturer, which is invariably dissolved or an asset-less shell; (2) the successor's ability to assume the original risk-spreading role and *273 (3) the fairness of requiring the successor to assume a responsibility which was a burden attached to the original manufacturer's good will and which has enured to the successor's continued operation of the business. The California court articulated the so-called "product line exception" to the traditional rule of no liability of a cash purchaser of assets as follows:
We therefore conclude that a party which acquires a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired. [136 Cal. Rptr. at 582, 560 P.2d at 11]
The California Supreme Court specifically overruled Ortiz v. South Bend Lathe Co., 46 Cal. App.3d 842, 120 Cal. Rptr. 556 (Ct.App. 1975), an opinion of a California intermediate court of appeals which was relied on by the trial judge in the present case when granting summary judgment in favor of defendant Amsted. The Ortiz court, in turn, relied on the trial court opinion in the New Jersey case of McKee v. Harris-Seybold, Co., above.
In Ortiz the court ruled on the identical transaction that is before us. The majority in Ortiz noted that in 1967, the year of the accident to plaintiff in that lawsuit, Amsted through its subsidiary South Bend Lathe division was engaged in the manufacture of the Johnson press under its trade name with facilities formerly owned by Johnson. As we previously observed, the Ortiz court found that Bontrager was ultimately liquidated by cash distributions to its shareholders. The prophetic dissent in Ortiz stated that all of Johnson's assets of every kind continued to be used in the manufacturing business by Amsted, which "must take the good with the bad, and the bad includes defective product liability." 120 Cal. Rptr. at 561.
Another case ruling on the implications of the transaction we consider today is Korzetz v. Amsted Industries, Inc., 472 F. Supp. *274 136 (E.D.Mich. 1979). The District Court there found that the Johnson-Bontrager-Amsted transactions meet the "continuity of enterprise" test under the applicable state law expressed by the Michigan Supreme Court in Turner v. Bituminous Cas. Co., above. The District Court found on the evidence before it that the South Bend Lathe division of Amsted continued to exploit Johnson's good will and to make presses under Johnson's name, while Bontrager led "an inert corporate existence" prior to its dissolution. The District Court did not consider Amsted's twice-removed status from Johnson "legally significant." Id. at 144. To the contrary is Hernandez v. Johnson Press Corp., 70 Ill. App.3d 664, 26 Ill.Dec. 777, 388 N.E.2d 778 (Ct.App. 1979), where, on a weak record, plaintiff failed to convince the Illinois appellate court to adopt a product-line exception to the traditional corporate rule and impose liability on Amsted for an allegedly defective Johnson press sold in 1952. The court in Hernandez placed considerable weight on the intermediate transaction with Bontrager in absolving Amsted. Other cases where courts have recently rejected the product-line exception when business continuity obtains are the companion cases of Leannais v. Cincinnati, Inc., 565 F.2d 437 (7 Cir.1977) (Wisconsin law), and Travis v. Harris Corp., 565 F.2d 443 (7 Cir.1977) (Ohio and Indiana law), wherein the majority stated that a change, if any, should be wrought by the legislature, while the dissenter would follow Ray v. Alad Corp., above. See, also, Woody v. Combustion Engineering, 463 F. Supp. 817 (E.D.Tenn. 1978); Menacho v. Adamson United Co., 420 F. Supp. 128, 139 (D.N.J. 1976) (stating "We do not think New Jersey would take that step"). These cases may simply represent the reluctance of some federal courts sitting in diversity cases to enlarge the scope of products liability where state courts have not spoken on the subject.
Both New Jersey and California have long been in the vanguard advancing the concept of strict liability in tort. The seminal California case, Greenman v. Yuba Power Products, *275 Inc., 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (Sup.Ct. 1962), has frequently been cited with approval by our courts. For example, in Santor v. A. & M. Karagheusian, 44 N.J. 52 (1965), our Supreme Court recognized the fairness of "enterprise liability," stating:
It must be said, therefore, that when the manufacturer presents his goods to the public for sale he accompanies them with a representation that they are suitable and safe for the intended use. As the Supreme Court of California said, such representation must be regarded as implicit in their presence on the market. Greenman v. Yuba Power Products, Inc., supra (27 Cal. Rptr., at p. 701, 377 P.2d, at p. 901). The obligation of the manufacturer thus becomes what in justice it ought to be  an enterprise liability, and one which should not depend upon the intricacies of the law of sales. The purpose of such liability is to insure that the cost of injuries or damage, either to the goods sold or to other property, resulting from defective products, is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves. Cf. id. (27 Cal. Rptr., at p. 701, 377 P.2d at p. 901). [At 64-65]
It is hardly necessary to trace the development of products liability law in this State from Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358 (1960), to Cepeda v. Cumberland Engineering Co., Inc., 76 N.J. 152 (1978), and Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150 (1979), to demonstrate the progressive character of our decisional law. It is sufficient to say that New Jersey has fully embraced the principles of enterprise liability and adopted as policy the philosophy of spreading the risk to society at large for the cost of injuries from defective products. The result in any particular case cannot, consistent with the expressed philosophy of our leading cases, turn on the intricacies of the law of corporate mergers and disclaimers. As this court stated last year: "Often the traditional principles of law are in conflict with the developing law of warranty on products liability," McDonald v. Mianecki, 159 N.J. Super. 1, 12 (App.Div. 1978), aff'd 79 N.J., 275 (1979), a case where defendant, *276 a vendor-builder of residential real estate, unsuccessfully sought refuge behind conventional real estate warranty concepts to escape responsibility for an implied warranty of fitness and habitability.
The trial judge in the case before us placed considerable weight on paragraph 2(c) of the 1962 contract wherein Amsted carefully limited its assumption of Bontrager's liabilities, thereby attempting to exclude any contingent products claims from its undertaking. We find this attempt at anticipatory exculpation wholly anachronistic in the context of the development of our product liability law. It is similar to the unsuccessful attempt by the automobile manufacturer to disclaim or severely limit liability for damages caused by products defects in Henningsen v. Bloomfield Motors, above, 32 N.J. at 404, where our Supreme Court said, "... we are of the opinion that Chrysler's attempted disclaimer of an implied warranty of merchantability and of the obligations arising therefrom is so inimical to the public good as to compel an adjudication of its invalidity." Attempts by the scriveners of entities who may become liable for future tortious activity to exculpate their principals from liability in advance have usually been unsuccessful in this jurisdiction, even where the plaintiff is a party to the exculpatory agreement. See Carbone v. Cortlandt Realty Corp., 58 N.J. 366 (1971) (landlord's negligence for water damage): McCarthy v. Nat'l Ass'n for Stock Car Auto Racing, 48 N.J. 539 (1967) (racer's injury suit against stock car association): Jutta's, Inc. v. Fireco Equipment Co., 150 N.J. Super. 301 (App.Div. 1977) (fire equipment purchaser's consequential damage claim). Exculpation in advance is even less justifiable when the plaintiff was not a party.
One of the principal contentions usually urged against imposing liability on the successor corporation is the exposure to claims for equipment sold many years in the past. In the present case, the Johnson press was placed into the stream of commerce about 28 years before the accident from which this suit arose. Defendant Amsted contends that it would be unfair *277 to recast the 1962 corporate deal and impose liability for a product sold so long ago. Our Supreme Court has held that a products liability cause of action accrues when the injury or damage occurs to person or property, not when the negligent conduct takes place or the defect is created. Heavner v. Uniroyal, Inc., 63 N.J. 130, 142 (1973); Rosenau v. New Brunswick & Gamon Meter Co., 51 N.J. 130, 137 (1968). If Amsted had made the product originally, the passage of 28 years alone would be no defense. If we were to yield to this argument, we would in effect be creating a special exception to the general statute of limitations. This we cannot do. A decision to limit the period of liability to a set number of years after the commission of the wrongful act is one for the Legislature to make. Indeed, the Legislature has acted to specially limit the liability of persons who design, plan, supervise or construct improvements to real property to the ten-year period following the performance of services or construction. N.J.S.A. 2A:14-1.1; see discussion in Brown v. Jersey Central Power & Light Co., 163 N.J. Super. 179, 192-194 (App.Div. 1978), cert. den., 79 N.J. 489 (1979). It has not done so for manufacturers of products.[2]
*278 We conclude that where, as in the present case, the successor corporation acquires all or substantially all the assets of the predecessor corporation for cash and continues essentially the same manufacturing operation as the predecessor corporation the successor remains liable for the product liability claims of its predecessor. Amsted therefore is responsible for the product liability of Johnson, notwithstanding the six-year intervening ownership by Bontrager.
Reversed.
NOTES
[1] The trial court's opinion in McKee has been invariably cited as having been "aff'd" by this court. The affirmance by this court in McKee was not an affirmance of the reported decision of the trial court dismissing as to a defendant successor corporation but was an affirmance of a final judgment for plaintiffs against unrelated defendants. The trial court holding in McKee has been sharply criticized, Shannon v. Samuel Langston Co., 379 F. Supp. 797, 802-803 (W.D.Mich. 1974); declared less than modern, Wilson v. Fare Well Corp., 140 N.J. Super. 476, 490 (Law Div. 1976), and characterized as "not unusually liberal," Litarowich v. Wiederkehr, 170 N.J. Super. 144, 151, n. 10 (Law Div. 1979).
[2] Approximately 17 states have adopted statutes of repose relating specifically to product liability claims. Products Liability Reporter 3380 (C.C.H. 1979).

Some of these limitations periods are tolled when the product is sold or leased while others are measured from the time the injury or damage occurred or should have been discovered. For example, all products liability actions in Arkansas must be commenced within three years after the date the injury or damage occurred. In Georgia, no action may be filed more than ten years after the first sale or consumption of the product. A third type of statute of limitations law is a hybrid of the first two. Oregon provides that suits against sellers must be commenced within two years of the injury but in no event more than eight years after the product was first sold. Ibid.
For interesting discussions of the merits and constitutionality of these special statutes of repose throughout the country, see Note, "Limitation of Action: Strict Liability in Tort  The Legislature has Intervened," 67 Ill.B.J. 214 (1978); Note, "When the Product Ticks: Products Liability and the Statute of Limitations," 11 Ind.L.Rev. 693 (1978); Note, "Statutes of Repose in Products Liability: The Assault Upon the Citadel of Strict Liability," 23 S.Dak.L.Rev. 149 (1978). For a recent case applying Florida's statute which requires that products actions must be brought within 12 years after the delivery of the completed product to the original purchaser, regardless of when the defect was or should have been discovered, see Diamond v. E.R. Squibb & Sons, Inc., 366 So.2d 1221 (Fla. Ct. App. 1979).