140 N.J. Super. 476 (1976)
356 A.2d 458
JOSEPH WILSON AND PERCINA WILSON, PLAINTIFFS,
v.
FARE WELL CORP., A CORPORATION OF MASSACHUSETTS, FORMERLY KNOWN AS GEO. S. HARWOOD & SONS, INC., A CORPORATION OF MASSASCHUSETTS, DAVIS AND FURBER MACHINE COMPANY, A CORPORATION OF MASSACHUSETTS, THE JAMES HUNTER MACHINE COMPANY, INC., A DIVISION OF CROMPTON KNOWLES CORP., A CORPORATION OF MASSACHUSETTS, CROMPTON KNOWLES CORP., A CORPORATION OF MASSACHUSETTS, JAMES HUNTER MACHINE COMPANY, INC., A CORPORATION OF MASSACHUSETTS, AND HUNTER INVESTMENT CORPORATION, FORMERLY KNOWN AS THE JAMES HUNTER MACHINE COMPANY, INC., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided March 11, 1976.
*479 Messrs. Freeman, Friedman, Wilson & Carney for plaintiffs (Mr. James F. Carney appearing).
Messrs. Weiss & Di Rienzo for defendant Davis & Furber Machine Co. (Mr. Joseph Di Rienzo appearing).
Messrs. Conway, Reiseman, Michals & Wahl for defendant Crompton & Knowles Corp. (Mr. Douglas Kleinfeld appearing).
Messrs. Hueston, Hueston & Sheehan for defendant James Hunter Machine Co., Inc. (Mr. Robert T. Hueston appearing).
FELLER, J.S.C.
In this civil case plaintiff Joseph Wilson is alleging he suffered injuries due to the defective design, manufacture, construction and maintenance of a certain machine by Fare Well Corp., formerly George S. Harwood & Sons, Inc., as succeeded by Davis and Furber Machine Company; The James Hunter Machine Company as succeeded by James Hunter Machine Company, Division of Crompton and Knowles Corp.; Hunter Investment Corp., formerly The James Hunter Machine Company Crompton and Knowles Corp. and the recently organized James Hunter Machine Company.
The action comes before this court by way of three motions for summary judgment  one in favor of defendant Crompton and Knowles Corp., one in favor of defendant Davis and Furber Machine Company, and one in favor of defendant James Hunter Machine Company.
*480 At the hearing the motion for summary judgment in favor of defendant James Hunter Machine Company was granted without objection due to the fact that this company did not even come into existence until approximately nine months after the alleged accident took place. Thus, as a matter of law and fact, it was found that this company could not be held liable for any of plaintiff's injuries.
The facts are not in dispute. Plaintiff sustained personal injuries while operating a machine consisting of five parts while in the course of his work at his place of employment, Supreme Felt. Four of the parts (the Garnett, lapper, floor apron and wind-up) were manufactured by The James Hunter Machine Co. and one part (the Bramwell Feeder) was manufactured by George S. Harwood and Sons, Inc. The machine in question was shipped to Supreme Felt in Elizabeth by George S. Harwood and Sons, Inc. and installed by the employees of The James Hunter Machine Co. in 1952. The Garnett parts and Feeder part were put together to form the complete machine.
The accident herein complained of occurred on April 28, 1972. Plaintiff alleges a cause of action against all defendants due to negligence, breach of warranty and strict liability. The liability of a manufacturer for the unreasonably unsafe products it places into the channels of trade has been clearly established in this state. Bexiga v. Havir Mfg. Corp., 60 N.J. 402 (1972). The actual merits of the case are not in issue. The major area of dispute is the basis upon which each defendant may be sued, taking into consideration the changes in corporate identities, and the sales of assets which have taken place between the time of manufacture of the machine and the time of the accident.
It is most important to understand the corporate history of each company as well as the agreements between the companies.
In the late 1800s The James Hunter Machine Company (Hunter) was incorporated for the manufacture and distribution of machines for the textile industry. On December *481 27, 1961 Crompton and Knowles Corp. (C & K) entered into an agreement with Hunter for certain of Hunter's assets, property and business. The closing date of sale to these assets was held on January 2, 1962. Thereafter, Hunter operated under the new name of Hunter Investment Corp. and C & K continued the manufacturing operations of Hunter under the name of James Hunter Machine Company, a Division of Crompton and Knowles.
The agreement between Hunter and C & K is lengthy and quite complex. It basically provides for C & K to acquire all inventory of goods, all machinery, jigs, tools, patterns, equipment, furniture, fixtures, real estate, buildings, trademarks, patents and good will of Hunter. However, it made specific exceptions for life insurance proceeds, trade notes and accounts receivable, securities, one piece of property in South Carolina, and "all claims and causes of action of every nature relating to operations prior to the date of closing and to obligations and liabilities not assumed by C & K hereunder." As consideration C & K was to pay Hunter in the following way: transfer of 30,000 shares of common stock of C & K to Hunter at an agreed value of $30 a share, a promissory note for $1,000,000 and cash if book values exceeded $1,900,000., plus $150,000. C & K agreed to assume all obligations under contracts with customers entered into in the ordinary course of business by Hunter accruing after the closing date, all liabilities under Hunter's retirement plan, all liabilities for group insurance, all real and personal property taxes assessed as of January 1, 1962 and thereafter, all labor contracts, all other contracts, leases or other instruments arising from prior agreements with Hunter. The president of Hunter became vice-president and director of C & K, as well as president of The James Hunter Machine Company, Division of Crompton and Knowles. Hunter agreed not to use its old name anywhere, not to engage in the business of developing, manufacturing or selling textile machinery, and to completely revise its corporate purpose *482 so that C & K benefits solely from its previously acquired trademark and good will.
After the closing date C & K operated exactly as Hunter operated. All machinery previously designed, manufactured and sold by Hunter was now done by C & K. The same equipment, management, employees and servicing arrangements which were available at Hunter were available at C & K. There were no basic changes in the operations regarding manufacture of either the Garnett machine or any other machinery which had previously been manufactured by Hunter.
In 1973 most of these same assets were sold back to The James Hunter Machine Company, Inc. Section 13 of that agreement stated:
It is further understood and agreed that nothing contained in this agreement, nor the consummation of the transactions contemplated hereby, shall in any way prejudice the rights or obligations of Crompton or Hunter Investment Corporation with respect to any claims or litigation now pending or hereafter instituted relating to or arising out of products sold by The James Hunter Machine Company prior to the closing under the 1961 agreement, it being understood and agreed that such rights and obligations shall be determined without reference to this agreement. Crompton and the Purchaser each agrees that it will cooperate with the other party in the defense of any such claims or litigation brought by third parties and will each use its best efforts to cause its respective employees to cooperate and assist therein.
Davis and Furber Machine Company (D & F) was incorporated in the late 1800s. The business of George S. Harwood & Sons, Inc. (Harwood) was also organized in the 1800s. On September 5, 1967 Sydney Harwood, doing business under the name and style of George S. Harwood & Sons, Inc., sold by assignment to D & F all right, title and interest to the trade mark of "Bramwell," together with the good will of the business symbolized by that trademark for $200,000. In addition, the Fare Well Corporation, Sydney Harwood, president, sold to D & F all its right, title and interest in and to the name of George S. Harwood & Son, *483 together with the good will of the business. Fare Well Corporation dissolved in May 1968.
In the agreement between Harwood and D & F, all rights of action, claims for damages, profits and costs, and any other demands for money held by Harwood in law or equity by reason of infringement on the trademark, were sold, assigned and transferred to D & F.
On September 25, the same day of the agreement, two letters were sent out  one by Harwood and one by D & F  to customers of the respective companies. The pertinent parts of Harwood's letter, signed by President Sydney Harwood, stated:

NOTICE TO CUSTOMERS OF CHANGE IN OWNERSHIP:
This is to advise you that Geo. S. Harwood & Son, Inc. ceased its manufacturing operations on September 25, 1967 and has sold to Davis and Furber Machine Company all properties which they will require for taking over and carrying on in North Andover, Massachusetts the manufacture of Bramwell Feeders and repair items for all outstanding Harwood machines.
THEREFORE, ALL FUTURE ORDERS AND INQUIRIES FOR WHAT HAVE HITHERTO BEEN HARWOOD PRODUCTS SHOULD BE DIRECTED TO:
DAVIS AND FURBER MACHINE COMPANY NORTH ANDOVER, MASSACHUSETTS 01845 TELEPHONE NUMBER: AREA CODE 617 687-7126
It will be to the advantage of all parties concerned if you will so notify any members of your organization who are concerned with the ordering of repair items for Harwood machinery owned by your company, or who may have occasion to require service of any kind of connection with same.

* * * * * * * *
We wish to express our thanks for the business you have given us in years past, and to assure you that our products are being taken over by a thoroughly reliable company which will be vitally interested in serving you as well as we have tried to do in the past. Finally, we think you will be glad to know that Mr. Albert R. Jee and I have joined the Davis & Furber organization and are in charge of manufacturing and servicing Bramwell Feeders.
The letter from D & F, signed by President Arthur W. Reynolds, stated:
*484 NOTICE TO ALL DAVIS & FURBER CUSTOMERS:
Davis and Furber Machine Company has now acquired the entire Harwood line of Feeders and Repair and Supply items. The enclosed letter of announcement is self-explanatory. All Harwood products will now be designed and built at Davis & Furber in North Andover, Massachusetts, as integral parts of the Davis & Furber line of textile machines.
Sydney Harwood, Albert R. Jee, and others of the Harwood group will join the Davis & Furber staff at North Andover. We are happy to welcome them.
For 104 years, Geo. S. Harwood & Son, Inc., has built the Bramwell line of Picker and Card Feeders, and we believe the joining of the two long-standing companies will strengthen the efforts in the advanced development of machines for the textile industry.
There are basically three types of corporate transfers: the sale of stock, the sale of assets, and merger or consolidation. Merely naming a transfer a particular type does not make it so. Courts consider substance over form, and look to the nature of the transaction as a whole as reflected in the sale agreement and its actual consequences. In McKee v. Harris-Seybold Co., 109 N.J. Super. 555 (Law Div. 1970), aff'd per curiam, 118 N.J. Super. 480 (App. Div. 1972), the New Jersey law in this area was clearly expressed by the court:
It is the general rule that where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, including those arising out of the latter's tortious conduct, except where: (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently in order to escape liability for such debts. (citations omitted). A fifth exception, sometimes incorporated as an element of one of the above exceptions, is the absence of adequate consideration for the sale or transfer. [109 N.J. Super. at 561]
It is rather clear from the agreements discussed above, as well as supplemental affidavits made by a former executive vice-president and present director of C & K, and by the president of D & F, that neither C & K nor D & F expressly *485 or impliedly agreed to assume liability for tort claims arising from the manufacture or sale of machinery prior to the respective sales. Thus, exception (1) in McKee does not apply.
It is equally clear that exceptions (4) and (5) do not apply. There are no allegations or proofs of fraudulent activities, or that there was inadequate consideration paid for the transfers.
Liability may be imposed upon a corporation when there has been a merger or consolidation. The definitions of a merger and consolidation were given in Applestein v. United Board and Carton Corp., 60 N.J. Super. 333 (Ch. Div. 1960):
A merger of corporations is the absorption by one corporation of one or more usually smaller corporations, which lose their identity by becoming part of the large enterprise. * * * A merger of two corporations contemplates that one will be absorbed by the other and go out of existence, but the absorbing corporation will remain. In a consolidation, the two corporations unite and both go out of existence, and a new amalgamated corporate enterprise takes the place of the former corporations. [at 342]
A de facto merger or consolidation will also operate to impose liability. The characteristics that are considered in determining whether a de facto merger or consolidation has taken place include transfer or sale of all assets, exchange of stocks, change of ownership whereby stockholders, officers and creditors go to the surviving corporation, and assumption of a variety of liabilities pursuant to previously negotiated agreements. See McKee, supra at 109 N.J. Super. 564, 67; Note, 55 Boston U.L. Rev. 86, 92-99 (1975).
A continuation of a business may be said to occur where the operations of the selling corporation become those of the buying corporation. The primary elements of continuation include use of the same name, at the same location, with the same employees and common identity of stockholders and directors. See Lopata v. Bemis Co., Inc., 383 F. Supp. *486 342, 345 (D. Pa. 1974); Kloberdanz v. Joy Mfg. Co., 288 F. Supp. 817, 821-22 (D. Colo. 1968).
New Jersey subscribes to a narrow "mere continuation" view and a narrow interpretation of de facto mergers and consolidations. The last authority setting out New Jersey's views was McKee, supra. In that case the court's criteria for finding a de facto merger were tightly circumscribed. The conditions necessary were numerous. The court found no evidence of a de facto merger or consolidation despite the fact that the selling corporation sold all its assets, property, business and good will, and authorized use of its name and agreed to change its name, and could not function as a manufacturer, and, in effect, lost its corporate purpose. The court stated that as long as the two corporations were strangers before and after the sale, and each corporation enjoyed a separate and distinct identity after the sale, the transfer would not be considered a de facto merger or consolidation. This was an extremely limited viewpoint. McKee, supra at 109 N.J. Super. 566-67.
The court also did not accept the argument that there was a continuation of actual manufacturing operations despite the fact that all lands, buildings, machinery and tradenames were sold, and the vice-president, secretary and treasurer became employees of the purchasing corporation. The court stated:
When one company purchases all the assets of another, it is to be expected that the purchasing corporation will continue the operations of the former, but this does not by itself render the purchaser liable for the obligations of the former. For liability to attach, the purchasing corporation must represent merely a "new hat" for the seller. [Id. at 570]
There are several cases from other jurisdictions which deal with the issue of successor liability. In Bouton v. Litton Industries, Inc., 423 F.2d 643 (3 Cir.1970), the purchasing corporation was held liable for product liability claims of future accidents even though the claims arose from *487 the design or manufacture of the product prior to the date of sale to the purchasing corporation. This was so because the contract for the sale of the entire assets was done with the clear intention of carrying that same business forward merely under a new ownership. Four broad categories of liability were specifically assumed: financial statement liabilities, all liabilities arising in the ordinary course of business, contractual liabilities, and scheduled liabilities. Thus, the purchasing corporation went beyond the point of indemnification to that of assuming all liabilities, including products liability.
In a more recent Third Circuit decision, Knapp v. North American Rockwell Corp., 506 F.2d 361 (1974), plaintiff alleged that his personal injuries were the result of negligent design and manufacture of a machine by TMW, and Rockwell as TMW's successor. In the time between manufacture and accident TMW exchanged all its assets for stock in Rockwell. TMW changed its name, disposed of all assets, distributed the Rockwell stock to its stockholders, and promised to dissolve as soon as practicably possible. 506 F.2d at 363.
The court stated the general rule that a corporation which purchases the assets of another corporation is not liable for its obligations unless the sale amounts to one of the above-discussed exceptions. The court then went on to look at the nature and actual consequences of the transaction and concluded that although not all the formal characteristics of a merger were met, the transaction was a merger.
It was stated:
Denying Knapp the right to sue Rockwell because of the barren continuation of TMW after the exchange with Rockwell would allow a formality to defeat Knapp's recovery. Although TMW technically existed as an independent corporation, it had no substance. The parties clearly contemplated that TMW would terminate its existence as a part of the transaction. TMW had, in exchange for Rockwell stock, disposed of all the assets it originally held, exclusive of the cash necessary to consummate the transaction. It could not undertake any active operations. Nor was TMW permitted under the agreement to divest itself of the Rockwell stock, so that it *488 might become an effective investment vehicle for its shareholders. Most significantly, TMW was required by the contract with Rockwell to dissolve "as soon as practicable." [506 F.2d at 368, footnotes omitted]
The court then added a strong public policy rationale for its decision. It was stated that although neither plaintiff nor Rockwell was in a position to prevent the accident, Rockwell was in a better position to absorb the loss. Rockwell could have protected itself by obtaining insurance. The judgment of the District Court granting summary judgment to Rockwell was reversed. 506 F.2d at 370.
The more modern, broad view has been recognized in two recent cases, one of which applies New Jersey law but criticizes the same.
In Cyr v. B. Offen & Co., Inc., 501 F.2d 1145 (1 Cir.1974), plaintiffs sued for injuries incurred in 1969 resulting from the negligent design and manufacture in 1959 of a machine of B. Offen Company. In 1962 the president and sole stockholder of B. Offen Company died. Employees continued to run the business and in 1963, joined by a single outside financier, contracted to buy the company from the executor of the estate. The primary focus of the sale agreement was for the company to continue its operations exactly as before. 501 F.2d at 1151. Continuity was the essence of the bargain.
The court stated the general rule and its exceptions, and posed the issue as whether there was sufficient evidence of continuity to warrant the conclusion that the transaction fell into the exception imposing liability for all obligations when there is a continuation of the business of the selling corporation. The Circuit Court of Appeals agreed with the District Court's decision to impose successor liability upon the purchasing corporation based upon the continuation exception.
The Court of Appeals listed four reasons for manufacturer's liability: (1) the manufacturer is in a better position to protect itself and absorb all costs; (2) the manufacturer placed the product into the channels of commerce; (3) the *489 manufacturer has violated an implied representation of safety in use of the product, and (4) the manufacturer is the one who improves the quality of the product. It then went on to apply this reasoning to successor liability. It stated:
The manufacturer's successor, carrying over the experience and expertise of the manufacturer, is likewise in a better position than the consumer to gauge the risks and the costs of meeting them. The successor knows the product, is as able to calculate the risk of defects as the predecessor, is in position to insure therefor and reflect such cost in sale negotiations, and is the only entity capable of improving the quality of the product. [at 1154]
In concluding, the court stated that it is only proper that if "the same employees continue, without pause to produce the same products in the same plant, with the same supervision, the ownership of the entity which maintains essentially the same name cannot be the sole controlling determinant of liability." Id. at 1154.
In Shannon v. Samuel Langston Co., 379 F. Supp. 797 (W.D. Mich. 1974), plaintiff claimed damages after losing his left arm while working the Langston machine. However, in 1966 Langston became a wholly-owned subsidiary of Harris Intertype (Harris). Harris acquired all the assets of Langston, including its name, by exchange of its own stock exclusively. Langston later dissolved, and in 1968 a statutory merger took place. All operations continued as a Division of Harris  the same headquarters, same management, same employees, same cash accounts.
The court applied the New Jersey law as stated in McKee and summarized the characteristics of a de facto merger  continuity of management, personnel, physical location, assets and general business operations; continuity of shareholders since the purchasing corporation pays with its stock; seller ceases operations and dissolves; assumption of obligations necessary for the uninterrupted continuation of normal business operations. Applying McKee, the court held a de facto merger had taken place and that there had been *490 a total continuation of business sufficient to impose liability on the successor corporation.
If the court had stopped there, it would have been ruling only on the law as it stood. But the court went on to discuss the public policy behind imposition of products liability upon a purchasing corporation. In so doing the court sharply criticized the narrow approach taken by New Jersey. The court stated that a corporate entity which obtains all benefits of a going concern should also assume all its burdens. It noted that New Jersey gives corporations "maximum leeway" in organization. However, to permit complete evasion of liability by "shuffling papers and manipulating corporate entities" goes against basic public policy. Chief District Judge Fox, speaking for the court, eloquently stated:
The decision of the court simply means that the seller and purchaser corporations will not both be able to profit by cutting off liability for damages to battered and maimed people.
Maintaining a favorable corporate climate does not mean unrestricted laissez faire in New Jersey or in any other state, so far as the court is aware ... New Jersey can hardly develop a policy of encouraging the evasion of its own corporation code, especially where strong considerations of justice to individuals and enlightened social policy counsel a contrary result. [at 802-803]
Therefore, if one adheres to the more modern approach, the most relevant factor is the degree to which the predecessor's business entity remains intact. The more a corporation physically resembles its predecessor, the more reasonable it is to hold the successor fully responsible. In this way, the innocent, injured consumer is protected without the possibility of being left without a remedy due to the subsequent corporate history of the manufacturer.
Applying the law to the facts regarding C & K, it becomes clear that there has been both a de facto merger and a complete continuation of business such as to impose liability upon C & K for the tortious conduct of its predecessor. Every aspect of operation previously handled by Hunter was assumed by C & K. Half of the purchase price was with *491 stock. Most of the contractual and property liabilities were expressly assumed. All management, and other personnel were taken on by C & K. Hunter did operate as Hunter Investment Co. after the closing date, but under very different and limited conditions. It could not function except to hold onto the stock it received. A corporation cannot disable itself from responding to liability by changing its name or distributing all its assets. When an ongoing business assumes all the benefits of its predecessor and continues to function in the same manner as its predecessor, tort liability should attach. See Cyr and Shannon, supra.
The case is even stronger for holding D & F liable for the tortious acts of its predecessor, Harwood. This does not meet the requirements for a de facto merger or consolidation because there was no stock transfer, a different location was used to manufacture the same product and certain personnel was changed. But, from the consequences of the sales contract, and the letters sent by each corporation, the true intent of the transaction is apparent. D & F became an extension of Harwood such that the continuity of business exception is applicable. D & F became a "new hat" for Harwood. The two top personnel of Harwood (Albert Jee and Sydney Harwood) became in charge of manufacturing and servicing the same product, "Bramwell Feeders," for D & F. Others of the "Harwood group" also went to D & F. D & F stated that the transaction was a "joining of the two longstanding companies." Harwood stated that D & F was "taking over and carrying on" their business. Such language, employed by the men with first-hand knowledge of the meaning of the agreement, is conclusive as to the intended effect of the agreement  that being, for D & F to assume all the benefits and burdens of its predecessor in the continuation of the business.
One additional point will briefly be mentioned. There is authority which holds that the mere purchase of the assets of a manufacturer which had put a negligently designed device *492 into the channels of trade, imposes no duty to warn third persons of the negligence even when the buying corporation becomes aware of the negligence. Chadwick v. Air Reduction Co., Inc., 239 F. Supp. 247, 250 (N.D. Ohio 1965). This decision was predicated upon an analogy to the "Good Samaritan" rule whereby an ordinary bystander has no obligation to act "where the peril to the plaintiff has come from a source in no way connected with defendant's conduct or enterprises or undertakings, past or present, but where the defendant has it in his power by taking some reasonable precautions to remove the peril." Id. at 250 (citing Harper & James, The Law of Torts, at 1046). Mere purchase of assets, standing alone, without an agreement to assume liabilities, either expressly or impliedly, was held not to create a special relationship to third persons whose rights accrue because of former dealings with the predecessor corporation.
The decision in Chadwick was criticized in the case of Shane v. Hobam, Inc., 332 F. Supp. 526 (D. Pa. 1971). In that case plaintiff suffered personal injuries while operating a meat grinding machine at his place of employment. The machine had been manufactured by a company which sold all its assets to Hobam between time of manufacture of the machine and time of the accident. Plaintiff sought to hold Hobam liable for damages arising from defects in manufacture, design and delivery of the machine. In the sale agreement itself there was an indemnity provision for product liability arising before the sale was consummated. Therefore, the court held that Hobam did not assume responsibility for product liability claims in regard to equipment manufactured and sold by the predecessor prior to the closing date.
The court then evaluated the modern approach of an independent ground for liability, i.e., when some control over the product is given to the successor, as in servicing, or the successor becomes aware of a defect in the product, there is an assumption of liability for injuries thereafter caused by that product. See Note, supra at 109-111. The court called *493 the decision of Chadwick "cold-hearted," and pointed to its failure to adequately discuss the facts which could be applied to this modern approach.
The court stated that Hobam could hardly be considered an innocent bystander when it continued to operate under the name of its predecessor, received all assets and good will of the predecessor, and agreed to service equipment previously manufactured and sold. It stated that clearly, as to products sold after the closing date of sale, Hobam had the responsibility to test and improve the product. The decision failed to state that a duty was clearly imposed, but rather denied summary judgment as to this issue. The court concluded in pertinent part as follows:
If Hobam actually knew that the previously manufactured machine was significantly defective, was Hobam obligated to advise all of Smith's previous customers of the nature of the defect? Was Hobam obligated to notify all original purchasers of the nature of the defect even when the original purchasers were no longer serviced by Hobam and had no other business relationship with Hobam? Plaintiff is treading on uncharted precedential seas and while there may be a serious question as to whether he has tipped the balance of precedent in his favor, I am reluctant to, and therefore will not, grant a summary judgment before pertinent factual gaps in the present case are filled in, thereby permitting the above questions to be answered with greater precision.... As to the issue whether Hobam is responsible on a product liability or negligence rationale by reason of any knowledge which Hobam acquired or should have acquired of any significant defect in meat grinding equipment after Hobam's acquisition of Smith, the issue is left open for further discovery. [332 F. Supp. at 530-531]
In finding that there was a de facto merger between Hunter and C & K, that there was a continuation of business by C & K and D & F, and that an independent ground for liability may be imposed upon C & K and D & F upon a showing of control over, or knowledge of, the defective product, the court is departing from the narrow approach of McKee and adopting the more modern, fair-minded broad approach as stated in Shannon and Shane, supra.
*494 Therefore, the motions for summary judgment made on behalf of defendants Crompton and Knowles Corp. and Davis and Furber Machine Company are hereby denied.