175 N.J. Super. 447 (1980)
419 A.2d 1151
DEPARTMENT OF TRANSPORTATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
PSC RESOURCES, INCORPORATED, A DELAWARE CORPORATION, SUCCESSOR OF PHILLIPS RESOURCES, INC., A DELAWARE CORPORATION, BY CHANGE OF NAME ON JANUARY 16, 1974; DIAMOND HEAD OIL REFINING COMPANY, INCORPORATED, A DISSOLVED NEW JERSEY CORPORATION; AND NEWTOWN REFINING CORPORATION, A NEW YORK CORPORATION, SUCCESSOR OF AG-MET OIL SERVICES, INC., A NEW YORK CORPORATION, BY CHANGE OF NAME ON NOVEMBER 29, 1976, DEFENDANTS.
Superior Court of New Jersey, Law Division Hudson County.
Decided July 31, 1980.
*450 Thomas J. Germine, Deputy Attorney General, for plaintiff (John J. Degnan, Attorney General of New Jersey, attorney).
Charles F. Mandell and Paul H. Shur, for defendant PSC Resources, Incorporated.
Daniel L. Martin for defendant Newtown Refining Corporation (Dwyer, Connell & Lisbona, attorneys).
YOUNG, J.S.C.
The single issue submitted for determination is whether a corporation which purchases the assets of another corporation for cash is liable for damages arising from the environmental tort of its predecessor. Plaintiff Department of Transportation of the State of New Jersey (DOT) moves for summary judgment against defendant PSC Resources, Inc. (PSC) for damages to plaintiff's property caused by PSC's predecessor, codefendant Diamond Head Oil Refining Co., Inc. (Diamond Head). The facts are not in dispute, making the motion appropriate for disposition on the law. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954).
Plaintiff alleges that between February 1, 1946 and November 1, 1973 Diamond Head operated waste oil reprocessing and canning facilities at 1401 and 1427 Harrison Turnpike in Kearny, N.J. The facility at 1427 Harrison Turnpike was shut down in 1955 while operations continued at 1401 Harrison Turnpike. The complaint further alleges that in the operation of its facilities Diamond Head discharged oily wastes, sludge and contaminated waste water onto the adjacent property and into a body of *451 water known as Oil Lake. DOT acquired the property upon which Oil Lake was situated March 6, 1968.
Defendant PSC was incorporated as a subsidiary of Phillips Screw Company, Inc. under the laws of the State of Delaware as Phillips Resources Inc. on October 23, 1973 and received a certificate of authority to transact business in this State on October 31, 1973.[1] PSC was incorporated for the purpose of acquiring the stock and/or assets of Diamond Head. This purpose was effectuated on October 26, 1973 when PSC entered into a stock purchase agreement which resulted in the acquisition of 100% of the issued and outstanding stock of Diamond Head on November 1, 1973. The terms of the agreement required the officers and directors of Diamond Head to resign on November 1, 1973, while PSC's nominees, Arthur M. Vash, president and director of PSC, John J. Casey, treasurer and director of PSC, and Jerome E. Rosen, secretary and director of PSC, became the new directors and officers of Diamond Head. On the same date, within hours after their appointments, these new directors submitted a "Plan of Complete Liquidation and Dissolution" which PSC as sole stockholder adopted. After a certificate of dissolution was filed pursuant to N.J.S.A. 14A:12-2 the assets of Diamond Head, consisting of the plant and property located at 1401 Harrison Turnpike, Kearny, New Jersey, were transferred to PSC for less than $100.
From November 1, 1973 until November 3, 1976 PSC continued to operate the plant at 1401 Harrison Turnpike under the name "Diamond Head Oil Refining Company, Division of PSC Resources, Inc." DOT alleges that PSC continued Diamond Head's practice of pumping the accumulated waste water, which contained oil, solids, soluble organic compounds, heavy metals, sodium hydroxide and sodium silicate, from the low area of the facility into Oil Lake located on DOT's property. In June 1976 *452 Michael Polito, the Chief of the Emergency Response and Inspection Branch of the United States Environmental Protection Agency, Region II, while tracing the source of an oil flow into the marshes surrounding Exit 15W of the New Jersey Turnpike, inspected the Diamond Head facility. Polito observed a brownish liquid being discharged through a pipe to a lagoon in the rear of the facility and a black liquid flowing from the bottom of the lagoon through a pipe with an open valve into Oil Lake on the adjacent property. This black liquid was also leaching from the lagoon into the lake.[2]
On November 3, 1976 the Diamond Head facility was purchased by Ag-Met Oil Service, Inc., predecessor to Newtown Refining Corporation. Newtown is a codefendant in this action, but is not a party to the pending motion.
In 1977 plaintiff commenced the construction of a highway, Interstate 280. In the course of that construction, and as represented by plaintiff's counsel, under the direction and supervision of state and federal environmental authorities DOT had to remove and dispose of more than 10 million gallons of oil-contaminated water and more than 200,000 cubic yards of oily sludge from Oil Lake. Plaintiff alleges that the cost of such removal amounted to $4,918,436.
Suit was instituted by DOT against Diamond Head and PSC on September 14, 1977. Default was entered against Diamond Head on November 21, 1977. Several motions were raised by both sides to strike defenses and dismiss specific counts to the complaint, respectively. Those motions were disposed of in an opinion of Judge Geronimo reported at 159 N.J. Super. 154 (Law Div. 1978). In June 1978 the complaint was amended to include Newtown as a codefendant. The complaint was amended a second time in June 1980 to permit the inclusion of alleged violations of various environmental statutes, among which are *453 the following: Water Quality Improvement Act, N.J.S.A. 58:10-23.1 et seq.; the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 et seq.; the Environmental Rights Act, N.J.S.A. 2A:35A-4, which legislation permits any person to enforce state laws on pollution.
Corporate successor liability is dependent upon the structure of the corporate acquisition. Where a corporation is acquired by the purchase of all of its outstanding stock, the corporate entity remains intact and retains its liabilities, despite the change of ownership. A purchasing corporation will become liable for claims against the acquired company if the acquisition was in the form of a statutory merger or consolidation. Where, however, one entity "sells or otherwise transfers all of its assets to another company the latter is not liable for the debts and liabilities of the transferor, including those arising out of the latter's tortious conduct...." Jackson v. N.J. Mfrs. Ins. Co., 166 N.J. Super. 448, 454 (App.Div. 1979), certif. den. 81 N.J. 330 (1979); Jackson v. Diamond T. Trucking Co., 100 N.J. Super. 186, 192 (Law Div. 1968).
Notwithstanding the general rule of nonliability in asset acquisitions, a successor corporation will be liable if any one of the following four exceptions is met: (1) where the purchaser expressly or impliedly agrees to assume debts and liabilities; (2) where the transaction amounts to a consolidation or merger of the seller and purchaser; (3) where the purchasing corporation is merely a continuance of the selling corporation or (4) where the transaction is entered into fraudulently in order to evade liability for debts. Ibid. "A fifth exception sometimes incorporated as an element of one of the above exceptions is the absence of adequate consideration for the sale or transfer." McKee v. Harris-Seybold Co., 109 N.J. Super. 555, 561 (Law Div. 1970), aff'd on other grounds, 118 N.J. Super. 480 (App.Div. 1972).
The DOT argues that PSC is liable for the tortious conduct of Diamond Head on application of the principles here summarized. A reading of the affidavits, depositions and various agreements *454 and documents before this court makes clear that the issue of successor liability is narrowed as to whether PSC is a continuation of Diamond Head. Although PSC acquired Diamond Head by obtaining all the outstanding shares, the officers and directors of Diamond Head and PSC, as sole shareholder, dissolved the corporate entity.[3] A paucity of evidence exists to substantiate a finding that with the transfer of assets PSC was effecting a merger, either statutory or de facto; that PSC had agreed to assume Diamond Head's debts or liabilities, or that PSC was intent upon defrauding Diamond Head's creditors.[4]
Maintaining that PSC is a continuation of Diamond Head, the DOT relies on Judge Pindar's opinion in Jackson v. Diamond T. Trucking Co. There the judge concluded that Diamond T. Trucking was a mere continuation of Phillips Specials based on the finding that Phillips' assets were transferred to Diamond T. for nominal consideration, and that one Taylor, president, director and principal stockholder of both companies, was instrumental in effecting the transfer. Additionally, the judge determined that Taylor had knowledge of plaintiff's claim and imputed such knowledge to Diamond T. In reaching this conclusion, the judge reviewed five New Jersey cases dealing with successor liability: Couse v. Columbia Powder Mfg. Co., 33 A. 297 (Ch. 1895) (not officially reported); Parsons Mfg. Co. v. Hamilton Ice Mfg. Co., 78 N.J.L. 309 (Sup.Ct. 1909); Chorpenning v. Yellow Cab Co., 113 N.J. Eq. 389 (Ch. 1933), aff'd 115 N.J. Eq. 170 (E. & A. 1933); Aetna, etc., Co. v. International, etc., Corp., 117 *455 N.J. Eq. 190 (Ch. 1934); Fox v. Radel Leather Mfg. Co., 121 N.J. Eq. 291 (E. & A. 1936). Judge Pindar abstracted the common elements delineated in the following passage:
... [I]n each case there was (1) transfer of corporate assets (2) for less than adequate consideration (3) to another corporation which continued the business operation of the transferor (4) when both corporations had at least one common officer or director who was, in fact, instrumental in the transfer . . and (5) the transfer rendered the transferor incapable of paying its creditors claims because it was dissolved in either fact or law. [Jackson v. Diamond T. Trucking Co., 100 N.J. Super. at 196]
The DOT urges the court to apply strictly the five criteria to the transfer of Diamond Head's assets to PSC. It is clear that all five criteria are satisfied. Diamond Head transferred its assets for less than $100 to PSC, which continued the refining operations. At the time of the transfer both companies had the same officers and directors, who submitted a plan for the dissolution of Diamond Head and the transfer of assets to PSC. This plan, which was adopted by PSC as sole shareholder, rendered Diamond Head unable to pay the claims of its creditors. It should be noted, however, that in all the cases relied on by Judge Pindar in the Diamond T. opinion, as well as that opinion, the principals of each corporation were aware of an outstanding debt, as in Fox and Parsons, or an underlying obligation, as in Diamond T., Chorpenning, Aetna and Couse. Although a tort claimant becomes a creditor of the defendant on the date of the tort, Barbirecki v. Virgil, 97 N.J. Eq. 315 (E. & A. 1925), nothing before this court substantiates the assertion that PSC had knowledge, or should have known, of an underlying claim by DOT when the assets of Diamond Head were transferred. While knowledge of a contingent tort claim may be irrelevant to establish successor liability, such a factor was important in the Diamond T. decision, and the opinions cited therein.
Another distinction should also be noted. The Diamond T. Trucking Co. and its transferor, Phillips Specials, shared the same principals for almost one year. In the case at bar PSC and Diamond Head shared the same principals for, at most, a few hours. PSC acquired the assets of Diamond Head by a method known as a "two-step asset acquisition." Generally, a corporation *456 acquires all or most of the stock of another corporation, transfers the latter's assets, and then dissolves or liquidates that company.[5] In essence, the principals of Diamond Head, as appointed by PSC on November 1, 1973, were officers as a matter of form.
The distinctions drawn above between the facts in the case at bar and those in Diamond T. demonstrate the difficulty in applying the traditional principles to a tort claim. These exceptions to the general corporate rule of nonliability were developed to protect creditors and the rights of minority shareholders, as well as to determine liability in tax assessment cases. Comment, 61 Marquette Univ.L.Rev. 595, 598 (1978); Note, 44 Tenn. L.Rev. 905, 908 (1977). The corporate approach was not designed to apply to a cause of action in tort. One commentator has described the underlying policies of corporate law and tort law as "necessarily incompatible." Note, 10 Loy. of L.A.L.Rev., 584, 612 (1977). When both areas overlap, the courts have been inclined to interpret broadly the various exceptions basing their approach on public policy considerations.
The incompatibility of the corporate approach to successor liability as applied to tort cases is illustrated in the law relating to product liability. Turner v. Bituminous Cas. Co., 397 Mich. 406, 416, 417, 244 N.W.2d 873, 877-878 (Sup.Ct. 1976); See Fehl v. S.W.C. Corp., 433 F. Supp. 939, 946, n. 10 (D.Del. 1977). The incongruity that exists with the juxtaposition of these areas in the law is demonstrated by a brief review of some relevant cases.
The traditional corporate approach was used in McKee v. Harris-Seybold Co., 109 N.J. Super. 555 (Law Div. 1970), aff'd on other grounds, 118 N.J. Super. 480 (App.Div. 1972). There the court refused to find a de facto merger because one of the criteria to establish such a status (i.e., the assets were purchased *457 for cash rather than stock) was not met. Determining that successor liability did not exist, the court stated, "For liability to attach, the purchasing corporation must represent merely a `new hat' for the seller." Id. 109 N.J. Super. at 570. (citation omitted). A similar holding is found in Kloberdanz v. Joy Mfg. Co., 288 F. Supp. 817 (D. Co. 1968), where the court refused to find a de facto merger because the seller corporation continued to exist for a period of time after the sale.
To subdue the harsh outcome which resulted from an application of the traditional approach, several courts expanded the scope of the rule. See Knapp v. North American Rockwell Corp., 506 F.2d 361 (3 Cir.1974), cert. den. 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975); Cyr v. B. Offen & Co., Inc., 501 F.2d 1145 (1 Cir.1974), and Shannon v. Samuel Langston Co., 379 F. Supp. 797 (W.D.Mich. 1974). The respective courts in all three cases found successor liability, basing their expansive interpretation of the exceptions on essentially public policy reasons. This rationale was adopted by Judge Feller in Wilson v. Fare Well Corp., 140 N.J. Super. 476 (Law Div. 1976). With the intention of protecting an innocent, injured consumer, who is confronted with the possibility of being without a remedy because of the manufacturer's corporate history, the court reasoned that the more a corporation fully resembled its predecessor, the more reasonable it is to hold the successor fully responsible. Id. at 490.
The traditional corporate approach to successor liability in product cases was recast in Turner v. Bituminous Cas. Co., 397 Mich. 406, 244 N.W.2d 873 (Sup.Ct. 1976), and abandoned by the Supreme Court of California in Ray v. Alad Corp., 19 Cal.3d 22, 136 Cal. Rptr. 574, 560 P.2d 3 (1977). Although a modified version of the traditional test was used in the Turner case, the overall corporate approach to successor liability product cases was criticized by the court for rendering inconsistent results. Turner, 397 Mich. at 429, 244 N.W.2d at 883. The California Court in Ray instituted the product line test, which is based upon the strict liability policy of the manufacturer assuming the risk of injury. Among the factors the court considered in *458 finding that successor liability existed were that the transferee corporation used the trade name and customer list of its predecessor, produced the same product and held itself out as the same enterprise. See Note, 30 Vanderbilt L.Rev. 238 (1977).
A recent expression in New Jersey regarding successor liability is the opinion of the Appellate Division in Ramirez v. Amsted Industries, Inc., 171 N.J. Super. 261 (App.Div. 1979), certif. granted 82 N.J. 298 (1980). The court, in footnote 1, noted the sharp criticism that had been lavished upon the narrow approach of McKee. The court also recognized that an application of the traditional rules set forth in Jackson v. N.J. Mfrs. Ins. Co., 166 N.J. Super. 448 (App.Div. 1979), certif. den. 81 N.J. 330 (1979), as derived from McKee, would require an affirmance of a judgment of nonliability of the transferee corporation.[6] However, the court did call attention to the absence of any suggestion by plaintiff in the earlier Jackson case that the court depart from the traditional rules, as was petitioned in Ramirez.
The holding in Ramirez represents the abandonment of the traditional approach to successor liability in product liability cases. Judge King synthesized the strict liability rationale of Ray and the continuity of the business operation approach of Turner. Noting that New Jersey has fully embraced the principles of enterprise liability and adopted the policy of spreading the risk to society at large for the cost of the injuries from defective products, the court declared the law in the excerpt here quoted:
[W]here, as in the present case, the successor corporation acquires all or substantially all the assets of the predecessor corporation for cash and continues essentially the same manufacturing operation as the predecessor corporation the successor remains liable for the products liability claims of its predecessor. [171 N.J. Super. at 278; emphasis supplied]
*459 Before deciding if the traditional corporate test should likewise be abandoned in the case at bar, the issue whether the Ramirez standard is an appropriate substitute in the area of environmental torts must be addressed. The DOT maintains that an application of this test would be appropriate because the underlying policy rationale in product cases is similar to that in environmental cases. PSC argues, however, that plaintiff's cause of action does not lie in the realm of environmental tort, but rather in the area of trespass and nuisance. Defendant further asserts that, even if the gravamen of the complaint lies in environmental tort, such a tort cannot be analogized to one of product liability.
Addressing the defendant's first contention, this court determines that PSC's attempt to distinguish an environmental tort from those of nuisance and trespass does not succeed. Torts against the environment find their origin in the law of nuisance and trespass. The case of CEEED v. California Coastal Zone Conservation Com'n., 43 Cal. App.3d 306, 118 Cal. Rptr. 315 (D.Ct. App. 1974), provides a concise account of the evolution of the environmental tort. Calling the law of nuisance the oldest form of land use control, the court stated that it evolved from the ancient maxim "Sic utere tuo et alienum non laedes"-one must so use his rights as not to infringe on the rights of others. The California court continues with its narrative as follows:
At common law a public nuisance was defined as an act or omission which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all "Her Majesty's subjects." (Prosser, Torts (4th ed., 1971) § 88, p. 583). Subject to constitutional barriers against unreasonable or arbitrary action, the Legislature may declare that a specified condition or activity constitutes a public nuisance. [Id. at 318, 118 Cal. Rptr. at 324; citations omitted]
The power of the Legislature to clarify and define public nuisances, and thus modify the common law classification, was unequivocally acknowledged in Alpine Borough v. Brewster, 7 N.J. 42 (1951). There the Supreme Court of New Jersey declared (at 50): "Anything that unduly interferes with the exercise of the common right may be declared a nuisance and rendered abatable as such and otherwise remediable."
*460 Environmental legislation is an example of a legislative classification of a public nuisance, as illustrated in the CEEED opinion when it quoted an excerpt from Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), in which the court wrote: "Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power." Id. at 442, 80 S.Ct. at 815, 4 L.Ed.2d at 855. In essence, "[c]urrent legislation for environmental and ecological protection constitutes but `a sensitizing of and refinement of nuisance law'." CEEED, 43 Cal. App.3d at 319, 118 Cal. Rptr. at 324.
A parallel evolution of the law is seen in New Jersey. One commentator, noting that New Jersey, a state subject to a variety of environmental problems, has been a "vanguard of the environmental protection movement," observed that the New Jersey Legislature "has demonstrated a continued interest in the area by adopting more than two hundred environmentally related statutes...." Goldshore, "Trends in Environmental Litigation: A Survey of 1976 New Jersey Decisions," 9 Rutgers-Camden L.J'l 21-22 (1977). Several statutes were adopted to safeguard New Jersey's water resources. "The importance of protecting water has been recognized as an important public purpose." [Citations omitted]. N.J. Bldrs. v. Environmental Protec. Dep't, 169 N.J. Super. 76, 86 (App.Div. 1979), certif. den. 81 N.J. 402 (1979). The appellate court recognized the State's overriding concern and obligation to safeguard the public health in State v. North Jersey Dist. Water Supply Comm'n, 127 N.J. Super. 251, 260 (App.Div. 1974), certif. den. 65 N.J. 578 (1974), cert. den. 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974). The reach of such concern and obligation was described as follows: "This encompasses a comprehensive power, coupled with a correlative duty to control and conserve the use of its water resources for the benefits of all its inhabitants." Ibid.
Two examples of the exercise of this power by the Legislature are the statute codified as N.J.S.A. 23:5-28, which prohibits a person from allowing a deleterious substance to run into any of *461 the State's water, and Title 58 of the Revised Statutes, which comprises certain statutes designed "to prevent the degradation of the water quality and to preserve the environment." N.J. Bldrs. v. Environmental Protec. Dep't, 169 N.J. Super. at 85. While N.J.S.A. 23:5-28 imposes a penalty of up to $6,000 for each offense, N.J.S.A. 58:10-23.1 et seq. (repealed by L. 1976, c. 141, § 28) and its successor N.J.S.A. 58:10-23.11 et seq. the Spill Compensation and Control Act (Spill Act), permit recoupment for the costs of the clean-up of the spill. The legislative purpose of enacting the Spill Act is reflected in its declaration clause:
The Legislature finds and declares that the discharge of petroleum products and other hazardous substances within or outside the jurisdiction of this State constitutes a threat to the economy and environment of this State. The Legislature intends by the passage of this Act to exercise the powers of this State to control the transfer and storage of hazardous substances.... [N.J.S.A. 58:10-23.11a]
Similar legislation has been held to be a legitimate exercise of a state's police power. See Askew v. American Waterways Operations, Inc., 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973), reh. den. 412 U.S. 933, 93 S.Ct. 2746, 37 L.Ed.2d 162 (1973).
This review rebuts PSC's assertion that the complaint is outside the realm of environmental tort. The common law always afforded a landowner a remedy to recover for trespass and nuisance. The statutes relied on by plaintiff in its initial complaint and the complaint as amended codified this common law remedy when the nuisance or trespass was in the nature of water pollution. These remedies are in addition to those recognized at common law, rather than mutually exclusive thereof. The policy and rationale behind the enactment of the Spill Act as well as the other statutes are integral to the complaint and central to the issue submitted for determination.
As noted above, defendant further argues that the alleged tort committed by the defendant is not sufficiently analogous to products liability to warrant the use of the successor liability criteria as set forth in Ramirez. The salient characteristic in the product liability cases in which successor liability was found is *462 that in each the tort was declared to be one of strict liability. The threshold question becomes whether the alleged pollution of Oil Lake by PSC is a strict liability tort.
Absolute liability for nuisance has been recognized at common law where the defendant carries on an abnormally dangerous activity in an inappropriate place, or where an enterprise involves so great a risk to its surroundings that its location may be considered unreasonable. Prosser, Torts, § 84 at 575 (1971). An act, occupation or structure which is a nuisance at all times and under all circumstances regardless of location or surroundings is a nuisance per se and also incurs absolute liability. Scotch Plains Tp. v. Westfield, 83 N.J. Super. 323, 337 (Law Div. 1964).
Similar principles formed the foundation for the holding in Bridgeton v. B.P. Oil, Inc., 146 N.J. Super. 169 (Law Div. 1976). After reviewing the opinion in Rylands v. Fletcher, 3 H & C 774, 159 Eng.Rep. 737 (Ex. 1865), rev'd L.R., 1 Ex. 265 (Exch.Ch. 1866), aff'd L.R., 3 H.L. 330 (1868), and federal and state statutes controlling discharges of oil and other pollutants into bodies of water (33 U.S.C.A. § 1321; N.J.S.A. 58:10-23.1 et seq. and N.J.S.A. 26:3B-4), the court held that the possessor of a pollutant keeps it at his peril, making the possessor answerable to one who suffers provable loss thereby.[7] The rationale is framed in the following quotation:
In the case at bar the activity, storage of oil, created a substantial risk, and defendant therefore had a high standard of care imposed on him. Coupling the standard of care established by statute with the requirements for high standard because of the inherent dangers involved in the storage, defendant must be required to exercise an extremely high burden. [at 177]
The activity of defendant, the court concluded, made out a case of strict liability rather than of negligence. But cf. State v. Exxon Corp., 151 N.J. Super. 464 (Ch.Div. 1977), in which Judge Kentz declined to hold a company, not previously in the business of storing oil, strictly liable for a pollution condition created by *463 an independent third party, maintaining that the rationale behind strict liability  that an enterprise involving unusual hazards must pay its way  was not appropriate in that instance.[8]
In addition to a common law basis for the imposition of strict liability for discharging oil and other pollutants, several statutes impose liability without fault for similar acts. A number of these statutes, such as N.J.S.A. 23:5-28, N.J.S.A. 58:10-5 and 6, and N.J.S.A. 58:10-22 and 23, all of which prohibit the introduction of deleterious substances to the State's waters, impose civil penalties upon a violation. Additionally, the Spill Act and its forerunner, the Water Improvement Act, impose strict liability without regard to fault for all clean-up and removal costs on any person who discharges a hazardous substance into the waters of the state. N.J.S.A. 58:10-23.11g(c). Lansco, Inc. v. Environmental Protection Dep't, 138 N.J. Super. 275, 284 (Ch. Div. 1975), aff'd 145 N.J. Super. 433 (App.Div. 1976), certif. den. 73 N.J. 57 (1977). See Goldshore, "New Directions in Water Pollution Control," 100 N.J.L.J. 797 (1977).
PSC, however asserts that the Spill Act and the Water Improvement Act cannot be applied retroactively to any discharge of a hazardous substance prior to 1971. Plaintiff counters this position with the assertion that an act to amend the Spill Act, bearing the designation Assembly Bill 3542, L. 1979, c. 346 (Lezniak Amendment), now permits the retroactive application of the Spill Act to all spills antedating the effective date of the act, April 1977.
Judge Kentz has determined that the Water Improvement Act cannot be applied retroactively:
There is no language in N.J.S.A. 58:10-23.1 et seq. which would indicate that the Legislature intended the statute to be applied retroactively. The prohibition *464 in N.J.S.A. 58:10-23.5 is stated in the present tense as it applies to "any person responsible for discharging petroleum products debris or hazardous substances." Clearly the statute cannot be applied to past behavior or conduct. [State v. Exxon, 151 N.J. Super. at 481].
Moreover, retroactive application would "place the enormous burden of abating a condition created by a third party on the shoulders of a party innocent of any wrongdoing." Id. at 482. (emphasis supplied).
No reported decision to date has determined whether the Spill Act as amended by the Lezniak Amendment should be applied retroactively. This court is mindful of the judicial reluctance to attribute retroactive effect to statutory enactments, id. at 481; Howard Savings Inst. v. Kielb, 38 N.J. 186, 193 (1962), as well as the general rule that "statutes are to be operative in futuro only...." Pennsylvania Greyhound Lines, Inc. v. Rosenthal, 14 N.J. 372, 381 (1954). This rule was again detailed in the recent decision of Rothman v. Rothman, 65 N.J. 219 (1974), in which the court stated that the terms of a statute "will not be given retroactive effect `unless they are so clear, strong and imperative that no other meaning can be annexed to them....' Kopczynski v. County of Camden, 2 N.J. 419, 424 (1949)." Id. at 224. The Rothman court did note, however, that this is no more than a rule of statutory interpretation, designed solely to aid the court in its quest for legislative intent. "Where ... supervening considerations clearly compel a contrary determination, this like all other rules of statutory construction must give way." Id. at 224.
Likewise, a statute may not be applied retroactively if it would destroy a vested right. Legislative acts affecting remedies or modes of procedure, however, are given retroactive effect so long as the statute provides a change in the form of remedy or provides a new remedy for an existing wrong. This exception does not reach the case where no remedy existed before enactment of the statute. Pennsylvania Greyhound Lines, Inc. v. Rosenthal, 14 N.J. at 381.
The Spill Act violates neither of these general principles. By examining the relevant language of the Spill Act, the clear *465 intent of the Legislature to permit a retroactive application of the statute can be seen. The act as amended by the Lezniak amendment reads in pertinent part:
Notwithstanding any other provision of P.L. 1976 c. 141, [N.J.S.A. 58:10-23.11 et seq.], the department ... may remove or arrange for the removal of any hazardous substance which:
........
(3) Has been discharged prior to the effective date of this act to which this act is amendatory, if such discharge poses a substantial risk of imminent damage to public health or safety or imminent and severe damage to the environment. [N.J.S.A. 58:10-23.11f(b)(3); emphasis supplied]
........
Nothing in this section is intended to preclude removal and clean-up operations by any person threatened by such discharge ... [N.J.S.A. 58:10-23.11f(a)]
........
Any person who has discharged a hazardous substance or is in any way responsible for any hazardous substance which the department has removed or is removing pursuant to subsection b. of section 7 [N.J.S.A. 58:10-23.11f(b)] of this act shall be strictly liable, jointly and severally, without regard to fault, for all clean-up and removal costs. [N.J.S.A. 58:10-23.11g(c)]
These statutory references from the Spill Act explicitly manifest a legislative intent to afford the Department of Environmental Protection or any person to recoup costs for the removal of a discharge which posed imminent damage to the public health or imminent and severe damage to the environment, even though the discharge antedated the effective date of the Spill Act.
PSC cannot be heard to say that such a retroactive application would destroy a vested right. As already noted, the Spill Act is a codification of the common law cause of action in nuisance. The legislative remedy provided here, as in the Water Improvement Act, fixed as the measure of damages the cost of the removal of the harmful substance from the State waters. See Lansco, Inc. v. Environmental Protection Dep't, 138 N.J. Super. at 284. Thus, the Spill Act does not create a new cause of action; rather it provides a new remedy for an existing wrong within the context of Pennsylvania Greyhound.
*466 For these reasons this court determines that the Spill Act may be applied retroactively if the discharge poses a substantial risk of damage as set forth in N.J.S.A. 58:10-23.11f(b)(3). The DOT may seek to recover the appropriate statutory remedy since it was required to remove the hazardous substance at the insistence of the State Department of Environmental Protection and the Federal Environmental Protection Agency, a factor confirming that the discharge posed a substantial risk of imminent and severe damage to the environment.
Having reviewed decisional law and the statutes designed to safeguard the State's waters vis-a-vis pertinent product liability opinions, it is evident that claims to enforce such law sound in strict tort liability. The policy rationale for the imposition of strict liability in a defective product action is equally applicable to the present wrong for which relief is sought. The refinery is in a better position to protect itself and bear the costs of a discharge of pollutants from its facility into bodies of water than would be the public. In addition, the refiner is the instrumentality to look to for improvement of the waste disposal process, cf. Cyr v. B. Offen & Co., Inc., 501 F.2d at 1154 (in which the court stated that the manufacturer of a product is the instrumentality to look to for improvement). In its decision to impose strict liability upon the party who stores hazardous and polluting substances, the court in City of Bridgeton also drew an analogy to the jurisprudence of product liability. The analogy is set forth in the passage here quoted:
As a society we are constantly made aware of the diminishing quantity and quality of our environment.... [T]his is no longer the land of our fathers with its limitless bounty from sea to sea. This generation of Americans has seen its bounty wasted by mindless and reckless misuse. It has further seen the almost unchecked development of products whose ... misuse or improper employment leads to disfigurement and death. The law is not-ought not to be-so feeble as to exonerate those whose conduct causes harm to others by reason of such use or abuse. [Bridgeton v. B.P. Oil, Inc., 146 N.J. Super. at 177-178]
The nature and policy considerations of a product liability action are sufficiently analogous to those of the present action to warrant an abandonment of the traditional approach, and an application of the current test for successor liability as set forth *467 in Ramirez. Additionally, the rationale of strict enterprise liability, which undergirds this test, is apropos of the case at hand. The Ramirez court recognized that liability, as well as the philosophy of spreading the risk to society at large for cost of injuries resulting from the wrong, have been fully embraced in New Jersey. The adoption of such an approach prohibits the result in any particular case to "turn on the intricacies of the law of corporate mergers and disclaimers." 171 N.J. Super. at 275. A like rationale was advanced in Wilson v. Fare Well Corp., wherein the court-intent on protecting the innocent, injured party who is unable to proceed against the original tortfeasor-observed, "When an ongoing business assumes all the benefits of its predecessor and continues to function in the same manner as its predecessor, tort liability should attach." 140 N.J. Super. at 491 emphasis supplied.
PSC as sole stockholder dissolved Diamond Head, thus rendering DOT incapable of pursuing its cause of action against that entity. As a result plaintiff, with no recourse, seeks to recover from PSC. Unlike the Exxon decision wherein the transferee corporation was not engaged in the business of storing oil, defendant here engaged in the same enterprise as its predecessor. Since PSC derived the benefit of an established refining company's expertise and system of operation, it should also bear the burden of the operation. The successor is also in a better position to spread the cost of clean-up and removal costs. One commentator noted that oil "should be priced to bear all of its costs, including the hidden costs of clearing up pollution ..." Comment, 36 Brooklyn L.Rev. 350, 367 (1970).
This court determines that where "the successor corporation acquires all or substantially all the assets of the predecessor corporation for cash and continues essentially the same operation as the predecessor corporation ...," Ramirez v. Amsted Industries, Inc., 171 N.J. Super. at 278, the successor incurs liability for the damages resulting from any discharges of hazardous substances by its predecessor.
An application of this test to the facts in the present action indicates that PSC is the successor of Diamond Head. On *468 November 1, 1973 PSC purchased all of Diamond Head's assets for less than $100 cash. PSC conducted business at the facility under the name "Diamond Head Oil Refining Company, Division of PSC Resources, Inc." until 1976. The refinery was manned by virtually the same operating personnel. Several members of lower-level management remained in the employ of PSC after its takeover of the facility. More importantly, however PSC continued the same waste disposal process of Diamond Head, which is alleged to be the source for the pollution of Oil Lake. Based on these facts, it is apparent that PSC indeed continued essentially the same operation as Diamond Head.
PSC raises several arguments against the imposition of successor liability. First, PSC asserts that to burden it with such liability is unfair. Second, PSC states that it did not insure against such a risk, a determinative factor in products cases. Finally, after postulating a policy which would assure a profitable disposal of industrial waste, PSC argues that the expense of clean-up that ensues from the imposition of successor liability would derogate from such a policy.
The assertion that the doctrine of successor liability is unfair and creates surprise on the successor has been met by the courts in the product liability cases. "[T]his kind of surprise is endemic in a system where legal principles are applied case by case...." Cyr v. B. Offen & Co., Inc., 501 F.2d at 1154. Describing the argument of surprise as "without merit," the court in Turner v. Bituminous phrased its rebuttal in this language:
It is clear that once corporations considering such transactions become aware of the possibility of successor products liability, they can make suitable preparations. Whether this takes the form of ... insurance, indemnification agreements or of escrow accounts, or even a deduction from the purchase price is a matter to be considered between the parties. [397 Mich. at 429, 244 N.W.2d at 883]
Likewise, the courts have not been persuaded by the argument that the imposition of successor liability might create unpredictability in the market place or stifle commercial transfers of assets. Note, 44 Tenn.L.Rev., supra at 917. Liability for contingent obligations exists with mergers, "[y]et corporate *469 mergers continue to occur...." Turner v. Bituminous, 397 Mich. at 428, 244 N.W.2d at 882. This court adopts the reasoning of the Turner court and is likewise not persuaded by the argument of surprise.
Equally lacking merit is defendant's assertion that PSC was not insured against damages caused by such discharges. PSC contends that the availability of insurance was one of the key considerations invoked by the courts in the cases cited in Knapp v. North American Rockwell. This issue was addressed in an article on successor liability. Analyzing the court's decision in Knapp, the author noted that "Rockwell's failure to insure itself against losses such as the plaintiff's did not deter the court from determining that `Rockwell [was] better able to spread the burden of loss', and therefore should be subjected to liability for the tortious conduct of TMW [its predecessor]." Note, 6 Seton Hall L.Rev. 477, 494 (1975) (footnotes omitted). The Spill Act provides that owners or operators of major facilities submit information regarding "[t]he source, nature of, and condition of financial responsibility" requiring any one or a combination of the following: (1) insurance, (2) self-insurance or, (3) surety bonds payable to the New Jersey Spill Compensation Fund. N.J.S.A., 58:10-23.11d(e). It is obvious that the Legislature, by mandating the facility to furnish evidence of financial responsibility, intended the facility to bear the risk of liability for a discharge. The burden of bearing the risk being clearly delegated to a facility that discharges, defendant's argument regarding lack of insurance is unpersuasive.
Finally, PSC urges that there has to be a policy that permits business waste to be disposed of profitably. Generally, New Jersey maintains a favorable corporate climate. This, however, "does not mean unrestricted laissez faire in New Jersey or in any other state.... New Jersey can hardly develop a policy of encouraging the evasion of its own corporate code, especially where strong considerations of justice to individuals and enlightened social policy counsel a contrary result." Shannon v. Samuel Langston Co., 379 F. Supp. at 802-803. The cogency of this statement is underscored when one views the numerous statutes enacted to control and prevent water pollution *470 in this State. The various penalties and remedies provided by the statutes are to be assessed against anyone, including industry, who violates the respective provisions. Despite the increase in the cost of disposing of industrial waste, the Legislature weighed both interests and notwithstanding deemed the protection of the environment the transcendent consideration.[9]
Thus, while it is important to permit business waste to be disposed of in a profitable manner, such an interest must defer to the interest of enlightened social policy, here the safeguarding of the environment.
In conclusion, this court determines that the application of the traditional corporate approach to successor liability where the defendant and its predecessor have allegedly discharged a hazardous substance into the waters of this State is inappropriate. Rather, the test as set forth in Ramirez is adopted. Based on the criteria of that test and sustaining policy considerations, this court finds that PSC is the successor to Diamond Head, and is subject to liability for any claims against it arising from the discharge of pollutants onto the plaintiff's property.
NOTES
[1] By amendment to the certificate of incorporation, dated January 11, 1974, the corporate title was changed to PSC Resources, Inc., and on January 16, 1974 the certificate of authority was amended to reflect this change of corporate title.
[2] A sample of the black liquid was taken by Arthur Gevirtz, an Environmental Protection Agency Response Officer. The sample, designated as EPA Sample # 37182, was analyzed at the EPA laboratory in Edison, New Jersey. The analysis of this sample indicates a hydrocarbon content of 41%.
[3] DOT alleges that Diamond Head's dissolution under N.J.S.A. 14A:12-2 is fraudulent and without legal effect. No evidence is before this court to substantiate such allegation.
[4] The court in Wilson v. Fare Well Corp., 140 N.J. Super. 476 (Law Div. 1976), citing Shannon v. Samuel Langston Co., 379 F. Supp. 797 (W.D.Mich. 1974), in which the U.S. District Court applied New Jersey Law, summarized the elements of a de facto merger:

... continuity of management, personnel, physical location, assets and general business operations; continuity of shareholders since the purchasing corporation pays with its stock; seller ceases operation and dissolves; assumption of obligations necessary for the uninterrupted continuation of normal business operations. [140 N.J. Super. at 489]
[5] These transactions are planned in such a fashion for the purposes of corporate taxation and are considered a direct purchase of the assets by virtue of I.R.C. § 332, 26 U.S.C.A. § 332, if certain provisions of I.R.C. § 334, 26 U.S.C.A. § 334, are met. See Note, 42 Geo. Wash.L.Rev. 589 (1974).
[6] In the Jackson decision, which was decided eight months earlier than Ramirez, the court was also called upon to address the issue of successor liability in a products liability case. There, the court affirmed the summary judgment in favor of the defendant corporation, refusing to find it liable for any tortious wrongdoing of its predecessor.
[7] In Ryland v. Fletcher the English court found the landowner who had built a reservoir prima facie liable for damages that resulted to a neighboring mine shaft when the water escaped.
[8] The court in Exxon was not presented with the issue of whether a company or a successor company in the business of storing oil could be held strictly liable. A recognition that the imposition of strict liability would be appropriate where the defendant was engaged in such an enterprise is evidenced by the court's recognition of Lansco, Inc. v. Environmental Protection Dep't, 138 N.J. Super. 275 (Ch.Div. 1975), aff'd 145 N.J. Super. 433 (App. Div. 1976), certif. den. 73 N.J. 57 (1977).
[9] It should be noted that industry in New Jersey is assisted in meeting the financial burden imposed by compliance with environmental standards by granting a local property tax exemption for air and water pollution equipment, N.J.S.A. 54:4-3.56, and by industrial pollution control financing, N.J.S.A. 40:37C-1-18.